**EMICH MOTORS CORPORATION v. GENERAL MOTORS CORPORATION.**

No. 9620–9686.

United States Court of Appeals
Seventh Circuit.

March 3, 1950.

Rehearing Denied April 26, 1950.

Ferris E. Hurd, Chicago, Ill., Henry M. Hogan, Detroit, Mich., Henry F. Herbermann, New York City (Daniel Boone, Detroit, Mich., Thomas C. Strachan, Jr., Chicago, Ill., Charles R. Kaufman, Chicago, Ill., of counsel), for appellants.

Thomas Dodd Healy, Harold Stickler, A. Bradley Eben, Chicago, Ill., Martin S. Gerber, Chicago, Ill. (Irving Gordon, New York City, Edward Atlas, Chicago, Ill., Healy & Stickler, Chicago, Ill., of counsel), for appellees.

Before MAJOR, Chief Judge, and KERNER and SWAIM, Circuit Judges.

KERNER, Circuit Judge.

These are appeals from treble damage judgments and a judgment for costs in a suit brought by two closely related corporations for damages alleged to have been sustained as a result of violation by General Motors and General Motors Acceptance Corporation of the Sherman Anti-Trust Act, 15 U.S.C.A. § 1 et seq. The judgments for damages entered upon the verdicts of a jury, one for $1,050,000 in favor of Emich Motors Corporation, and the other in favor of U. S. Acceptance Corporation for $186,000, are for three times the amounts of the verdicts rendered. In addition, the District Court, after hearing further evidence without a jury, entered a supplemental judgment in favor of plaintiffs for costs and expenses in the amount of $257,358.10, of which $250,000 was for attorneys' fees. Both plaintiff corporations are owned by Fred Emich: one owned two franchises for dealerships for the distribution of Chevrolet automobiles; the other is a finance company, formerly named EMC Finance Company, organized to supply credit facilities for the purchase of new and used automobiles. We shall refer to plaintiffs as Emich Motors and the Finance Company.

The suit was based on a conspiracy which had been the subject of criminal prosecution under an indictment charging that defendants, with others, had combined to restrain interstate trade and commerce in Chevrolet and other automobiles manufactured by General Motors, for the purpose of controlling the financing of wholesale and retail purchases of such automobiles by compelling dealers to use the credit facilities of its subsidiary, the General Motors Acceptance Corporation. Defendants were found guilty as charged in the indictment, and this court affirmed that conviction. United States v. General Motors Corp., 7 Cir., 121 F.2d 376, certiorari denied, 314 U.S. 618, 62 S.Ct. 105, 86 L.Ed. 497. Plaintiffs here allege that they were injured by that conspiracy in that, in furtherance thereof, defendants cancelled the franchise contracts under which Emich Motors was engaged in business, thereby destroying the business of that corporation and that of the Finance Company which derived its business from furnishing credit facilities for the purchase and sale of new and used automobiles by that corporation.

Plaintiffs relied on § 4 of the Clayton Act for their right to recover for injuries arising out of the violation of the Sherman Act for which defendants had previously been convicted, and § 5 for aid in the pre-

sentation of their case. 15 U.S.C.A. §§ 15 and 16. They therefore attached to their complaint a copy of the indictment charging the conspiracy of which defendants had been found guilty. Defendants in their answer denied that the cancellation of the two franchises had been caused by Emich Motor's refusal to use GMAC or was connected with any conspiracy or illegality. They asserted, on the contrary, that the reason for the cancellation was the violation by Emich Motors of the terms of the franchises and a course of conduct relating to customer service and financing practices resulting in serious dissatisfaction on the part of 'Chevrolet purchasers and justifying termination of the franchises.

Inasmuch as various questions are raised on these appeals as to the availability and applicability of the earlier proceeding to this suit we deem it advisable first briefly to set forth the facts as to the criminal suit. Our outline of these facts is largely derived from the opinion of this court affirming the judgment of conviction. In essence, the indictment charged that defendants, with others, conspired to restrain unreasonably the interstate trade and commerce in Chevrolet and other automobiles manufactured by General Motors, for the purpose of controlling the financing essential to the wholesale purchase and retail sale of such cars, and that in furtherance of this purpose the conspirators devoted themselves to concerted action by which GMAC was imposed on dealers who were engaged in the purchase and sale of General Motors cars. The specific conduct charged in furtherance of the illegal purposes was: (1) Requiring dealers to promise to use GMAC exclusively as a condition to obtaining General Motors franchises; (2) making contracts for short periods and cancellable without cause, cancelling or threatening to cancel such contracts unless GMAC facilities were used; (3) discriminating against dealers not using GMAC by refusing to deliver cars when ordered, delaying shipment and shipping cars of different number, model, color or style; (4) compelling dealers to disclose how they financed their wholesale purchases and retail sales, examining and inspecting books

and accounts in order to procure this information, and requiring dealers to justify their using other financing media; (5) giving special favors to dealers using the wholesale and retail facilities of GMAC; (6) granting special favors to GMAC which were denied to other discount companies; (7) giving dealers a rebate from the GMAC financing facilities; and (8) compelling dealers to refrain from using other finance companies by all other necessary, appropriate or effective means.

Included in the evidence introduced to sustain the charge of conspiracy to compel dealers to use GMAC financing was that of thirty-eight then dealers and ten ex-dealers, including Emich whose corporations are the plaintiffs here. Emich testified that he had been a 'Chevrolet dealer in Chicago from 1932 to 1936, and that because he owned his own finance company which he insisted upon using for his purchases and sales, he received unordered cars and trucks and experienced other difficulties in his business which he said he was told would cease if he would give GMAC his finance business. His franchises were cancelled in 1936, and he testified that upon his appeal to the president of General Motors for reinstatement he was told that the cancellation was for his failure to use GMAC and that it was the policy of General Motors to require dealers to use the facilities of that corporation, and if he would not agree to do so it would be useless for the president of General Motors to discuss reinstatement with the appropriate Chevrolet officials.

In instructing the jury, the court pointed out the limits within which the defendants might promote GMAC, and stated that they had a right to select any dealers they saw fit, determine upon what terms to sell their cars, expound the advantages of GMAC, and persuade dealers to use it. But the court added that they could not utilize existing and prospective contracts with dealers as "clubs or instruments of coercion" to compel acceptance of GMAC, and then stated that that was in effect the fact question of the case, whether the dealer could act as a free man, of his own free will. The court further stated, in response to defendants' request for a further instruc-

tion, that it correctly stated the law: "* * * if the jurors find that General Motors dealers have been restrained as a result of an agreement entered into among the defendants, effectuated by the acts alleged in the indictment, they should find the defendants not guilty, unless they also find that the interstate trade and commerce in General Motors automobiles which moves through the retail outlet which those dealers constitute * * * have been unduly restrained as a result thereof." Further portions of the instructions, not referred to in our earlier opinion but which become significant on these appeals, were to the effect that it was not necessary for the Government to prove all of the acts alleged; that, "It is essential that they prove this conspiracy, and if you believe that the evidence is sufficient to sustain that conclusion, then you have a right to find that there is a conspiracy, but it is not essential to that conclusion that each and every one of the acts charged in the indictment shall be proved," and that, "They have a perfect right to have a finance company and to recommend its use. They have a perfect right to cancel a contract from their dealer as long as they are not performing any unreasonable act."

· The jury found all corporate defendants guilty as charged in the indictment, and acquitted all individual defendants.

· In presenting the case here involved, plaintiffs relied upon the judgment of conviction in the criminal case. In addition they · introduced the evidence of sixteen dealer witnesses who described their own experiences with defendants, and all of whom asserted that ·their own dealerships were either cancelled· for failure to use GMAC or continued only upon their promise to use it. Emich himself testified as to the facts alleged to have led up to the cancellations and also as to damages suffered by both his corporations. Other witnesses testified as to the matter of damages alleged to have been suffered by plaintiffs. Plaintiffs also introduced a large number of documentary exhibits, most of which were obtained from defendants' files in response to discovery and other pre-trial proceedings. Inasmuch as no question is raised as to the sufficiency of the evidence to support the verdicts on which the judgments are based, we deem it unnecessary to set forth any of that evidence here.

The serious questions on these appeals have to do with the admission and exclusion of evidence. Defendants contend that they were prevented from adequately presenting to the jury their evidence showing their actual reasons for terminating the Emich dealerships and the justification for such terminations, while at the same time they were seriously prejudiced by the introduction of the judgment in the criminal proceeding which they assert was inadmissible as to the issues of this case, which prejudice was aggravated by permitting the indictment to go to the jury as an exhibit in the case, and by confusing and misleading instructions as to the applicability of the criminal judgment and record pertaining thereto.

■ Although plaintiffs stated in their briefs on appeal that they relied on the judgment in the criminal case "as an independent statutory method of making a prima facie case showing the existence of the conspiracy," they also contend that they were entitled to rely on the prior proceedings as an estoppel extending "to such matters as the existence of the conspiracy, the means, and the acts committed in furtherance thereof, all as charged in the indictment." They assert that Local 167, International Brotherhood of Teamsters v. United States, 291 U.S. 293, 54 S.Ct. 396, 78 L.Ed. 804, is authority for this contention. An examination of the proceedings in that case discloses a very different situation from the one here involved. The suit there was one in equity against sixty-eight defendants, three of which were unincorporated associations and the balance individuals who had previously been found guilty of conspiracy to restrain interstate commerce in live and dressed poultry in the New York area. The suit also named a number of additional individual defendants not brought into the earlier criminal proceedings. When all the defendants filed answer denying the charges of the conspiracy, the court granted the motion of the Government to strike the pleading as to the pre-

viously convicted defendants, holding that such denials were obviously sham, and made for obstructive purposes. The case establishes, in effect, that the prior criminal conviction is res judicata as to the fact of the conspiracy and *every matter essential to establish it* as against the parties to the earlier proceeding. See Note, 44 H.L.R. (1930-31) 997. And under § 5 of the Clayton Act, parties suing for redress of injuries resulting from violation of the antitrust laws may utilize a previous proceeding to the same extent as could the parties thereto. However, it remains a matter for the court to determine the scope and applicability of the previous judgment, as it did in the New York case, and certainly it could not rightly be held here that the judgment convicting the corporate defendants and acquitting all the individual defendants through whom the corporations must have acted, operated as an estoppel not only as to the fact of the existence of the conspiracy but also as to *all* the means and acts charged in the indictment, as plaintiffs would have us hold. "Where an indictment charges various means by which the conspiracy is effectuated, not all of them need be proved." United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 250, 60 S.Ct. 811, 856, 84 L.Ed. 1129. That being the case, a judgment on such an indictment does not establish the performance of all the means charged.

Defendants' theory as to the applicability of the judgment goes to the other extreme. They contend that a proper inspection of the entire record in the criminal proceeding, the admissibility of which they concede for this limited purpose, discloses that it did not constitute an estoppel as to any fact material to the issues in this case. They define the essential elements of this action under 15 U.S.C.A. § 15 as: 1. A general conspiracy by defendants to delay deliveries of cars and to cancel dealers who did not finance through GMAC. 2. An impact of some illegal activity engaged in by defendants in the course of such conspiracy, i. e., delays or cancellations, upon plaintiffs' business or property. 3. Damages proximately resulting from such impact. Obviously the judgment has nothing to do with the third element, and they urge that it also has no bearing on the first two for the reason that under the instructions to the jury, the question whether the conspiracy was to delay deliveries or to cancel franchises was left open, and the jury could have found defendants guilty of the conspiracy even though it did not consider them guilty of these two particular acts. Defendants further urge that inasmuch as the indictment charged restraint in the trade in all General Motors automobiles as well as Chevrolet, it left open the question whether the restraint was directed to Chevrolet dealers. They rely on Russell v. Place, 94 U.S. 606, 24 L.Ed. 214, where the Court held that an estoppel by judgment exists only as to factual issues that can be shown *definitely* to have been determined by the prior action.

■ We are convinced that the meaning defendants seek to give to the judgment is too limited, and that plaintiffs were entitled to rely upon it as prima facie evidence that defendants had been guilty of a conspiracy to restrain dealers' interstate trade and commerce in General Motors cars for the purpose of monopolizing the financing essential to the movement of those cars. This was the basis for their statutory cause of action for treble damages. The preparation of the proper pleading for Anti-Trust Act suits requires a statement of matters and their relation to each other far more extensive than that in a simple pleading in negligence or on contract. See Beegle v. Thomson, 7 Cir., 138 F.2d 875; United States v. Schine Chain Theatres, D.C., 31 F.Supp. 270. A complaint to state a cause of action must show not only damages sustained by the individual plaintiff, but also a violation of public rights prohibited by the Act. Wilder Mfg. Co. v. Corn Products Refining Co., 236 U.S. 165, 35 S.Ct. 398, 59 L.Ed. 520, Ann.Cas.1916A, 118; Shotkin v. General Electric Co., 10 Cir., 171 F.2d 236. And we think the judgment is available at least for the limited purpose of establishing that there had been a violation of public rights in the absence of which plaintiffs would have no cause of action under the statute, and from which violation they assert their injury stemmed.

Hence we approve the ruling of the District Court— "* * * all that was intended by Section 16, 15 U.S.C.A., was that plaintiffs in cases of this nature were to be accorded the advantage of establishing a prima facie case of conspiracy to violate the anti-trust laws by merely introducing the judgment of conviction in the criminal case. The nature of the evidence upon which that judgment rests is wholly immaterial and irrelevant. * * * What issues were determined by the judgment of conviction are questions of law to be decided by the court and not issues of fact to be decided by the jury in this case."

While we are convinced that the trial judge announced the proper principles for determining the applicability of the criminal judgment, we think he did not conform to or correctly follow his own ruling. The error relates principally to the uses to which he permitted plaintiffs to put the indictment in the criminal proceedings. They attached a copy of it to their complaint; counsel read from it at length in opening statements to the jury, and in closing, referred to the restraints alleged in it as established by the judgment of conviction; the trial judge summarized it at length in his instructions to the jury; and, most serious of all, the indictment was sent to the jury as an exhibit in the case.

Whether or not there was error in the first matters referred to, we are convinced that serious error was committed in permitting the jury to consider the indictment itself as evidence in the case. And that was certainly the effect of its use as an exhibit. It told the jury that it could look to it to ascertain the *means* and the *acts* committed in furtherance of the conspiracy of which defendants had been convicted. But we have shown that since it was unnecessary for the Government to prove the performance of any of the acts or means, except for the purpose of establishing venue, in order for the jury in the criminal proceeding to find defendants guilty, it was for the court to examine the indictment as an aid in determining or defining the issues presented by the earlier case, and it should not have been introduced as an item of evi-

dence in the proceeding here involved. And the error of permitting the indictment to be used as evidence was not only not corrected by the instructions but was in fact aggravated by the following ones relating to the evidentiary use of the judgment:

"The judgment in the criminal case was admitted in evidence in this case, pursuant to the law to which I have just referred, for the purpose of the plaintiff making a prima facie case against the defendants as to one of the issues of this case and only and solely for the purpose of defining, describing, and limiting the scope of the judgment on the verdict which was entered in that case, namely, the conspiracy to violate the anti-trust laws.

"The burden is on the plaintiffs of establishing by a preponderance of the evidence that they were injured by the defendants *pursuant to or in the course of a conspiracy* and in order to recover damages for the cancellation of the Chevrolet franchises they must prove by a preponderance of the evidence *including the criminal judgment* that the defendants entered into a conspiracy to compel the use of General Motors Acceptance Corporation by agreeing among themselves, among other things, to cancel dealers who failed or refused to use General Motors Acceptance Corporation to a satisfactory extent and that the franchise of Emich Motors Corporation *was cancelled by reason of and pursuant to* said conspiracy and not because of the things alleged by defendants as the reasons for such cancellation * * *" (emphasis added).

The first paragraph quoted above appears to us to be needlessly confusing. The second not only permitted the jury to consider the judgment as evidence that there had been a conspiracy, but also allowed it to consider it as evidence that Emich Motors' franchises were cancelled pursuant to that conspiracy. That the court had previously stated that, "Being prima facie evidence, the judgment is not conclusive in this case. It is merely sufficient evidence of a violation by these defendants of the anti-trust laws to put these defendants to their proof.

* * * It was unnecessary that each and every one of the acts charged in the indictment be proved before the jury could find the defendants guilty of the charges made by the indictment; * * *" does not seem to us to be sufficient to clear up the confusion or rectify the error.

Plaintiffs contend that the indictment was properly admitted on the ground that the criminal judgments included it by reference, hence were incomplete without it. We do not so construe the judgments against these defendants. The verdict was "Guilty in manner and form as charged in the indictment," and each judgment recited a finding of guilt of the offense charged in the indictment," * * * to wit: * * * Violation of Sherman Anti-Trust Law." The scope of such a judgment may better be determined by reference to the instructions of the court to the jury than to the allegations of the indictment. And where, as in the criminal case here relied on, the court expressly told the jury that it need not find the defendants guilty of all the acts and means as charged, such acts and means are not to be considered as established by the finding of guilt.

Plaintiffs rely on Eastman Kodak Co. v. Southern Photo Materials Co., 5 Cir., 295 F. 98, 102, as authority for the admissibility of the indictment. There the court admitted, over objections of defendant, the complaint, answer, opinion and final decree in an earlier equity action brought by the Government against the defendant for violations of the anti-trust laws said to be similar to the violations complained of in the suit for damages, with an instruction to the jury that they limit their consideration of the effect of such evidence to the final decree. The Court of Appeals held, without discussion, that the pleadings were admissible to explain the issues upon which the decree was based and that the error in the admission of the opinion was harmless in view of the fact that the court "limited the effect of this evidence to the decree, and of the further fact that the verdict was for much less than could reasonably have been rendered * * *." On review of the decision by the Supreme Court, 273 U.S. 359, at page 369, 47 S.Ct. 400, at page 402, 71 L.Ed. 684, it appears that the objection to the introduction of the pleadings in the earlier case was abandoned—the Court stated that the issues presented did not involve the existence of the monopoly which was not questioned and the allegations as to which had been supported by the final decree in the equity suit, introduced as prima facie evidence of defendants' violation of the Anti-Trust Act.

Plaintiffs also rely on Bigelow v. R.K.O. Radio Pictures, 7 Cir., 162 F.2d 520. In that case, defendants in a supplemental proceeding brought to obtain additional relief after entry of a judgment for damages in a suit for violation of the anti-trust laws, objected to a ruling that estoppel by verdict extended to every issue involved in the prior litigation between the parties. This, however, involved a very different situation from the one here. On appeal, this court observed that the original complaint stated but one cause of action which, if proved, entitled the plaintiffs to two kinds of relief, namely, damages and an injunction. The same judge who presided in the trial of the damage action heard the application for an injunction. The two proceedings involved separate aspects of the same action. Hence, the court, speaking through Judge, now Mr. Justice Minton, approved the use of the complete record in the damage phase of the litigation for the purpose of enabling the court to determine what had transpired during the trial and appeal of the damage issue.

We are convinced that none of these cases are authority for the admission of the indictment for the purposes to which it was put under the circumstances of this case, and further, that permitting it to go to the jury as an exhibit served to give to the allegations of acts and means a certain evidentiary value which, under the instructions of the court in the criminal proceeding, they did not have.

We are fortified in our view of the limitation on the use of the indictment by a decision in another case related to the criminal case against defendants here. See Ford Motor Co. v. United States, 335 U.S. 303, 69 S.Ct. 93. At the time of the indictment against the General Motors and

other defendants, similar proceedings were brought against the Ford Motor Company and the Chrysler Company. Both the latter companies entered into consent decrees by which, in effect, they bound themselves not to engage in any practices found illegal by the decree in the General Motors case. By ¶ 12a(2) of the consent decree it was provided that: "A general verdict of guilty returned against General Motors * * * followed by the entry of judgment thereon, shall be deemed to be a determination of the illegality of any agreement, act or practice of General Motors Corporation which is held by the trial court, *in its instructions to the jury* to constitute a proper basis for the return of a general verdict of guilty." (Emphasis added) Subsequently a question arose as to further continuance of the restraints imposed by the consent decree in the light of the judgment against General Motors. In discussing the proper method of resolving the question, the Court, 335 U.S. at page 319, 69 S.Ct. at page 101, observed that the Government insisted that since the indictment charged that certain practices violated the Sherman Law and since evidence had been introduced to support the charge, "the jury might have found General Motors and GMAC guilty of 'coercion' at least partly on the basis of that evidence. But sub-paragraph 12(a) (2) was not designed to authorize speculative reconstruction of the jury's process in reaching its verdict. It provided a definite standard for ascertaining what rules of law were at a future date to be made binding on a competitor of Ford. The rules which the trial judge formulated against General Motors were thereafter to be the rules of law against Ford. * * *."

While obviously this case lays down no rule of law in the case before us, we think the principle is apt in determining the scope of the estoppel here. Section 5 of the Clayton Act is no more designed to authorize speculative reconstruction of the jury's process than is the specific provision of the consent decree. Hence, we think, that case furnishes us a guide that where means and acts are charged in an indictment, even though some evidence may have

been introduced as to all, the instructions of the court under which the verdict was reached furnish a more reliable guide to the scope of the judgment rendered thereon than the indictment charging the offense of which the defendants were found guilty. And in view of the instruction in the criminal case that it was not essential to the finding of guilty of conspiracy that every act charged in the indictment be proved, and that the defendants there had a "perfect right to have a finance company and to recommend its use" and that "They have a perfect right to cancel a contract from their dealer as long as they are not performing any unreasonable act" the ruling of the trial judge in this case, permitting the jury to consider the indictment as an exhibit in evidence thus giving it evidentiary value, was error, and such error as was very likely to prejudice the jury in its consideration of defendants' defense.

As we have already observed, the defense in this case was that the cancellation of the two Emich franchises was for cause, and not pursuant to any conspiracy to compel it to use GMAC financing. Defendants sought to prove that their motive for the cancellation was the persistent and repeated acts of fraud and misconduct in the operation of the dealerships and the Finance Company, the result of which, they asserted was to bring Chevrolet into disrepute.

We agree with defendants that the most important issue in this case was their motive in cancelling the Emich franchises. Certainly before plaintiffs could recover treble damages for the alleged wrongful cancellation they had to establish that such cancellation was pursuant to a conspiracy to compel the use of GMAC. They were assisted in their proofs by § 5 of the Clayton Act which permitted them to use the criminal judgments as prima facie evidence. But before they could recover, it was necessary for them to prove the impact of the conspiracy upon themselves. And if defendants could show that they cancelled the dealerships for any other reason than Emich's failure or refusal to use GMAC, then the cancellations could not be said to be in furtherance of the illegal conspiracy.

We recognized in the criminal case, 121 F.2d at pages 400-401 and 406, that it was proper for General Motors to promote manufacturer's goodwill and to protect itself against inefficient and unscrupulous dealers, and that there were perhaps among its dealers some who were unscrupulous and who used fraudulent finance methods. However, we said that that fact did not justify forcing all dealers to use GMAC because such unscrupulous dealers could be dealt with without penalizing all others. Defendants relied upon this observation of ours and sought to show that Emich was an unscrupulous dealer and that under our decision they were not required to continue to do business with him. And they assert as error the exclusion of so much of their evidence offered to support this defense as to render it wholly ineffective in their presentation of it to the jury.

The greater part of the oral evidence offered by plaintiffs to sustain their allegation of wrongful cancellation as a part of the illegal conspiracy was that of sixteen former dealers in General Motors cars, all of whom described similar practices designed to compel their use of GMAC financing—delivery of wrong models, unordered trucks, parts or accessories, withholding of models ordered, threats, and, if they persisted in their refusal to use GMAC, cancellation of their franchises. Plaintiffs contended that all of this dealer evidence demonstrated the impact of the conspiracy upon others in the same situation as Emich Motors. Two former General Motors employees described methods which they stated were regularly used by defendants to bring pressure on dealers to compel the use of GMAC.

Emich himself testified that he had taken over his first Chevrolet dealership at the request of General Motors in 1932, and that nothing had been said about the use of GMAC, and that General Motors knew he had been financing his own purchases and sales in connection with another dealership he was then operating. During the same year, he gave up this other dealership, again at the request of General Motors, and accepted a second Chevrolet franchise in its place. Later, as business conditions improved, General Motors began pressing him to use GMAC financing instead of his own, and after he incorporated the Finance Company to handle the finance business he had previously carried on individually, these pressures were increased. They followed the same pattern described by the sixteen other former dealers—threats, withholding of deliveries and wrong deliveries, with promises of relief if he would give GMAC his finance business. He said they also demanded that he purchase more equipment for his shop and increase his capitalization. He insisted that his capital was sufficient, and he also stated that he and his finance company had financed over two hundred sales without any charge to the customer just to get the orders. Later, he said, attempts were made to obtain voluntary relinquishment of his franchises and when he refused to comply with the demands of General Motors, both his franchises were cancelled. He further testified that he was told on his appeal to Knudsen, the president of General Motors, that he had not been giving them his finance business and that was why he had been cancelled. This latter testimony was corroborated by the testimony of a friend who stated that he accompanied Emich to Detroit and was present at the interview with Knudsen.

On cross-examination Emich denied that he had ever been told that a reason for the cancellation of his Chicago store was that he had continued excessive finance packing on new and used cars or that officials had told him of their receipt of customer complaints abouts overcharges and poor service, or that the reason General Motors was complaining was not because he financed his own paper but because he was gypping his customers by his overcharges, and he stated that he had told them that he charged the same rates as other standard nonrecourse companies.

It is clear that the question of finance overcharges became one of the most sharply contested issues of the trial. Counsel for plaintiffs stated that " * * * the finance charges is none of their business and what an independent dealer does with his financing is no concern of theirs," relying on our decision in the criminal case

as authority for the exclusion of any and all evidence relating to financing. Counsel for defendants, on the other hand, asserted, "We do not regard that decision as * * * holding that General Motors, once it grants a license, must permit its dealers to systematically fleece the public by collecting excessive finance charges." They therefore sought to prove by various means, including evidence of complaints received by General Motors from customers of plaintiffs, that the latter regularly engaged in a practice of overcharging, that knowledge of this practice had come to the attention of defendants, and that it was this knowledge which impelled them to cancel the franchises.

The importance of the issue relating to evidence of overcharges is emphasized by a statement of counsel for plaintiffs when the matter of this court's assertion that General Motors could deal with unscrupulous dealers was under discussion, "You are going to rule us out of court if you make that ruling." When the question first arose, the trial judge indicated that any complaints as to finance charges or otherwise which came to defendants' attention were admissible for the purpose of showing dissatisfied customers. Later he modified this to a ruling which he thereafter followed, that finance-complaint witnesses could be asked only whether they had made a complaint to General Motors and, if so, whether it was by letter, telephone call or in person, and whether it was in reference to financing, but without stating that they claimed they were being overcharged, and without introducing the complaint letter, if any. Defendants objected to having their evidence limited in this way since it did not enable them to establish the extent of the dissatisfaction or whether there was any substantial basis for it. The trial judge further limited the evidence of complaint letters by admitting only those the writers of which were produced as witnesses to identify them.

Other offers of proof with respect to financing were entirely excluded on the theory that the evidence offered was immaterial or that it would require a comparison of rates. Thus the trial judge excluded an offer to prove by the evidence of a former employee of Emich, who had been his bookkeeper for a period of two years, that his instructions to her and to his salesmen were that they were to get all the money they could; that one of the items shown with respect to every transaction financed through the Finance Company was known as "overage," and that this consisted of packing the selling charges over and above the charges shown on the rate chart; and that in all the time this witness was employed by Emich there was never a transaction financed through the Finance Company that did not have the overage, and that the amount was not consistent, but was whatever the salesman had been able to get away with without the customer's knowing it.

The trial judge also excluded defendants' exhibit 173, a chart prepared for the purpose of showing that the rates charged by the Finance Company for financing new Chevrolet cars at retail were not fixed and bore no definite relationship to the amount to be financed for the term of the instalment financing. The exhibit was also offered to show that the charges actually imposed by the Finance Company on instalment purchases of new Chevrolet cars from Emich Motors amounted to five or six times the charges that would have been applicable had those transactions been financed by nonrecourse companies including a number which were doing business in the Chicago area during the period and all of which had a single standard rate of finance charge. Counsel offered further to call witnesses who would be qualified by testimony that they were certified public accountants who had examined the books of the Finance Company and Emich Motors and prepared the exhibit and that it showed with respect to every new car sale made by Emich Motors and financed by the Finance Company during the first five months of 1936: (1) Date of sale, (2) customer's name, (3) the amount of the obligation financed which was the total of (a) the unpaid balance, and (b) the insurance charge. The exhibit further included the finance charges, (1) at standard 6% rate of nonrecourse companies and (2) the Finance Company, and (3) the difference between

these two, and (4) the "Per cent Which EMC Finance Company Charges are of Charges at Standard 6% Rate."

█ Plaintiffs assert that Exhibit 173 was properly excluded because it set up a standard which was false on both sides in that it grossly overstated charges of the Finance Company and understated those of the other companies. If this is true it appears that it could fairly easily have been demonstrated by cross-examination of the witnesses who prepared the chart and whom defendants expected to present in support of it. Plaintiffs also object to the lack of qualifications of the witnesses offered, but this also could have been brought out by examination. They say further that the exhibit relates in part to transactions occurring after cancellation of the franchises. An inspection of the exhibit discloses that it presents data as to 141 transactions during the first five months of 1936, and that of those 141, 47 occurred after the cancellation of the franchises. Since, for reasons presently indicated, the fact of lack of knowledge of the data contained in the exhibit was immaterial, this objection does not appear substantial. However, had the exhibit been admitted, it would have been a very simple matter to delete these particular items and either recompute the totals or exclude totals from consideration—these totals do not appear to have any particular significance.

Plaintiffs also claim that there is no showing that Chevrolet had knowledge of the transactions covered by the exhibit. However, evidence offered by defendants, only a part of which was admitted, tended to show that serious irregularities as to plaintiffs' financing practices had come to their knowledge. This they tried to prove was one of their principal reasons for cancelling the franchises. We think they were entitled to substantiate this defense by proof of actual irregularities.

A further objection was that the exhibit was offered in rebuttal of testimony of Emich on collateral matters brought out by defendants on cross-examination, citing Foster v. United States, 8 Cir., 145 F.2d 873, which holds that where a witness is asked concerning a collateral matter on cross-examination, the party cross-examining is bound by the witness' answer. We do not agree that, under the circumstances of this case, the matter of finances is collateral. It is true that we held in the criminal case that the superiority of GMAC service over its competitors was irrelevant as were defendants' asserted fears that "unregulated dealers' financing would promote such evils as packing, excessive repossessions and cut-throat methods of competition." But there we found ample evidence to show that the coercive conduct was not intended to discriminate against an inferior or unreliable finance but rather to prevent any use of an independent finance service. 121 F.2d at page 400. Moreover, we were there dealing with the case of a general conspiracy, the alleged benevolence of the motive of which we held did not exculpate it. But in so holding we expressly recognized that among the 15,000 General Motors dealers there might be unscrupulous ones against whom General Motors might find it necessary to take special measures. And certainly we did not mean to imply that General Motors would have to stand idly by while any of its dealers engaged in business practices calculated to bring themselves into disrepute and reflect discredit on the manufacturer who licensed them to engage in business.

In the criminal case we noted a possible distinction between the situation of customers dissatisfied over faulty performance of their cars and those dissatisfied over financing, commenting that it was improbable that the latter would blame GMC because they were dispossessed or defrauded by an independent finance company. But in the actual case presented here defendants offered evidence calculated to demonstrate that the improbable had occurred. The large number of complaints received by GMC based on finance as well as service indicated that customers were holding GMC responsible for both. And it must be remembered that the financing complained of here was not that of the independent company we referred to in the criminal case, but that of a party to the suit, wholly owned by the sole owner of

the corporation holding the two dealer franchises.

The exclusion of the evidence relating to finance which we have decided wrongly prevented a fair presentation of a legitimate defense was rendered even more prejudicial during the course of the trial. Counsel argued to the jury (without objection, it is true) that there was "no determination of what a finance company charges," and that, "To charge a man with having overcharges, you have got to have a standard. Presumably you have got to have a lawful standard." And yet all evidence as to rates and charges had been excluded as the result of the protests of plaintiffs. Counsel further argued to the jury, again without objection, that there was "not one iota of truth in it that Mr. Emich was actually packing finance charges," and that they had heard "a lot of wild talk about finance charges and packs, excessive overcharges and things of that sort, but not from the mouths of anybody." In view of plaintiffs' very vigorous objection to the admission of any evidence relating to finance charges, going to the extent of assertion by one counsel that a ruling permitting it would "rule us out of court," such argument was very improper.

Defendants also make the point that the court erred in its rulings relating to their evidence on faulty service and large numbers of customer complaints offered to substantiate another of the grounds for the cancellations. The dealer franchise required the maintenance of service station facilities satisfactory to the Seller (General Motors), and compliance with all its requirements as to servicing new cars, chassis, parts and accessories. Emich testified on direct examination that he had told defendants' officials that it was ridiculous to talk about customer complaints as a reason for the cancellations because 90% of those complaints were caused by defective parts, poor paint, and other matters for which the manufacturer was to blame, not the dealer, and he described the lengths to which he had gone to build up goodwill in servicing.

Defendants sought to establish the existence of a considerable amount of customer dissatisfaction with Emich service which had been brought to the attention of the Chevrolet organization, and their difficulties in attempting to adjust the various complaints. A former assistant service manager for the Chicago area, one of whose duties was the supervision of service employees in the area, testified to the receipt of over two hundred complaints from Emich customers, some 60 of which were in writing. When defendants sought to introduce these written complaints as evidence of their knowledge of dissatisfaction, one of the grounds asserted by them for the cancellations, the trial judge excluded as hearsay all except those whose writers could be brought in to identify them. The witness was, however, permitted to testify as to what was done about the complaints he had taken up with the Emich service manager. The trial judge also rejected other offers of proof by a GMAC employee of the receipt by it of Emich customer complaints, relating to financing, to the effect that the customer had requested GMAC and been refused it or had been promised it and found after signing papers that they had been given other financing or that the finance charges were at rates considerably in excess of not only GMAC but also standard nonrecourse companies.

We agree with defendants that the complaint letters received by them should have been admitted, not for their testimonial use, to prove the facts contained therein, but to show the information on which they acted. This is a well-established exception to the hearsay rule. VI Wigmore on Evidence (3rd Ed.) §§ 1789, 1729; Lawlor v. Loewe, 235 U.S. 522, 35 S.Ct. 170, 59 L.Ed. 341; Greater New York Live Poultry etc. v. United States, 2 Cir., 47 F.2d 156.

Our study of the record has disclosed, in addition to what we deem major errors which we have discussed in some detail, other errors stemming from what we have held were the erroneous rulings as to financing and hearsay. The general effect of these also was to unduly hamper the presentation of the defense.

Another ruling of the trial judge seems to us to be prejudicial. We have noted that the serious issue of the proceeding was that of General Motors' reason for cancelling the franchises. Plaintiffs contended it was a part of the general conspiracy to compel the use of GMAC, and they produced sixteen other former dealers who testified as to the impact of the conspiracy on them, and then sought to show the parallel between these dealers and Emich Motors. In other words, plaintiffs not only used this evidence to corroborate other evidence as to the conspiracy on which their case was bottomed; they also, by arguing the parallel, sought to use it as proof of the impact of the conspiracy on Emich.

Defendants categorically denied the evidence of all the sixteen witnesses. And they further sought to show that many of their dealers did not use GMAC and several owned their own companies and used them for financing their purchases and sales. This evidence was excluded on the ground that it was negative. We do not quarrel with this ruling generally, although it does appear to us to be a borderline case —it is not clear to us why the evidence of sixteen dealers that they lost their franchises for failure to use GMAC should have any more probative value as to the issue of impact of the conspiracy on Emich than that of the same or any other number of other dealers that they did not use GMAC and did not lose their franchises. However, in addition to refusing defendants' offer of proof by some sixty other dealers to this effect, the trial judge also sustained plaintiffs' objections to questions by defense counsel intended to establish their dealer-witnesses' background and business qualifications when one of such qualifications was the fact of ownership of private finance companies in addition to their dealerships. The basis for the trial judge's ruling was that although it was undoubtedly proper for counsel to show background and business under ordinary circumstances, in this case he thought the plaintiffs would be more harmed by letting the evidence in than defendants would be by keeping it out, and this in spite of defendants' offer to use it

only for the limited purpose of establishing the witnesses' testimonial qualifications and not to refer to it otherwise. And this ruling was followed to the extreme in refusing to permit one of the associates in a corporation which succeeded Emich Motors in the operation of one of the dealerships to testify as to the extent of their use or non-use of GMAC, and the sustaining of plaintiffs' objection to defendants' offer to prove by this witness that when they took over the Emich location they were not using GMAC for any of their wholesale financing, and that they sold over 90% of their retail financing to nonrecourse companies and less than 10% to GMAC. Objection was likewise sustained to a similar offer of proof by another of the associates in the successor dealership.

Another error asserted was the rulings of the trial judge with respect to damages. The principal evidence as to the amount of damages was that of an accountant, Lynch. He stated that he determined normal earnings attributable to the tangible assets invested for the period from 1932 to 1936, using 7½% as the factor of normal return and then subtracted this amount from average earnings for the same period. The excess, under his method of computation, represented good will which he capitalized at 10%. Both these percentages were entirely his own, not based on any custom or usage but simply what he considered reasonable under the circumstances—without stating what those circumstances were. He gave no factual material from the books as the basis for his computations, and no particular reasons why he considered the percentages reasonable. With the background of his computation thus appearing to be very speculative and subjective, he stated that the value of the goodwill of Emich Motors was $113,603.50, and that of U. S. Acceptance, $62,232.

As another element of damages Lynch estimated the value of sales lost by the two dealerships for the period from 1934 to 1936. He used figures furnished by Emich who stated that he lost the sale of seventy-five cars at each location during the year 1934 as a result of the failure of General Motors to deliver cars ordered. He had no

records to substantiate this figure or anything near it but said the information was in his mind and heart. Lynch used these figures not only to establish profits lost on the sale of new cars but also to figure losses on used cars according to a ratio he said was shown by the records.

In giving his testimony as to average profits for the dealerships for the years 1934, 1935, and 1936, Lynch was allowed to state them before federal taxes and before salaries to officer-owners. He did not use the original records or supporting evidence as he would have if he had been preparing an audit, and there was no evidence as to the authenticity of the books—in fact the records from 1932 to 1936 were not even available except as to the book entries he used. He did not prepare a balance sheet; he did not consider liabilities, and there was no verification of the accuracy of the records used.

We realize that damages are not uncertain because they cannot be calculated exactly, and that it is difficult to establish precise losses resulting from interference with the normal course of business, and that for that reason, when the fact of loss and damage has been established, resort may be had to something less than precise record evidence in determining the amount of such loss and damage. Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 47 S.Ct. 400, 71 L. Ed. 684; Bigelow v. R.K.O. Radio Pictures, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652. However, it seems to us that here, the evidence submitted by plaintiffs as to the issue of damages was so extremely speculative and conjectural as to furnish no sound basis for the amount allowed.

We have given the record, consisting of over nine thousand printed pages, and the exhaustive briefs of counsel much time and serious thought, and from our study of the case have reached the conclusion that the trial judge erred in his rulings on the inclusion and exclusion of evidence and in his instructions to the jury, which affected the substantial rights of the defendants, hence we must reverse the judgments and remand the case with directions to grant a new trial. We should perhaps add that our ruling in this case is in no way to be understood as a retreat from our decision in the criminal case that defendants may not conspire to restrain unreasonably the interstate trade and commerce in automobiles manufactured by them in order to control the financing essential to purchases and sales by dealers, or compel the use of their own finance agency for such financing. We do hold, however, that before an individual dealer may recover damages under the provisions of the Clayton Act for the alleged impact of such conspiracy upon himself he must demonstrate the fact of such impact upon himself, and defendants must not be deprived of their right to a fair presentation of their defense. And while we have heretofore observed that no question is presented here as to the sufficiency of the evidence in this case (except as to the amount of damages), we are convinced that defendants were not afforded a fair opportunity to meet that evidence—due in part to the trial judge's misconception of the opinion of this court in the criminal case.

Reversed and remanded.