EMICH MOTORS CORP. ET AL. *v.* GENERAL
MOTORS CORP. ET AL.

No. 209.   Argued January 3–4, 1951.—Decided February 26,
1951.

*Anthony Bradley Eben* argued the cause for petitioners. With him on the brief were *Thomas Dodd Healy, Harold Stickler* and *Edward Atlas.*

*Ferris E. Hurd* argued the cause for respondents. With him on the brief were *Henry M. Hogan, Henry F. Herbermann* and *Daniel Boone.*

*Solicitor General Perlman, Acting Assistant Attorney General Underhill, Philip Elman, Victor H. Kramer, J. Roger Wollenberg* and *Baddia J. Rashid* filed a brief for the United States, as *amicus curiae,* urging reversal.

MR. JUSTICE CLARK delivered the opinion of the Court.

This action was brought in the United States District Court for the Northern District of Illinois under § 4 of the Clayton Act [1] to recover treble damages for injuries alleged to have been suffered by reason of a conspiracy in restraint of trade in violation of the Sherman Act, § 1.[2] Plaintiffs, petitioners here, are Emich Motors Corporation, a former dealer in Chevrolet cars, and its related finance company, U. S. Acceptance Corporation. Respondents are General Motors Corporation and its wholly owned subsidiary finance company, General Motors Acceptance Corporation (GMAC).

Prior to this action respondents had been convicted in the Federal District Court for the Northern District of Indiana on an indictment charging them, and certain of their officers and agents who were acquitted, with a conspiracy in restraint of interstate trade in General Motors cars. At trial in the instant case petitioners were per-

---

[1] 38 Stat. 731, 15 U. S. C. § 15.
[2] 26 Stat. 209, 15 U. S. C. § 1.

mitted to introduce the antecedent criminal indictment, verdict and judgment as evidence under § 5 of the Clayton Act, which provides in part that

"A final judgment or decree rendered in any criminal prosecution or in any suit or proceeding in equity brought by or on behalf of the United States under the antitrust laws to the effect that a defendant has violated said laws shall be prima facie evidence against such defendant in any suit or proceeding brought by any other party against such defendant under said laws as to all matters respecting which said judgment or decree would be an estoppel as between the parties thereto . . . ." [3]

A judgment for petitioners was reversed by the Court of Appeals for the Seventh Circuit partly on the ground that the trial court erred in the use it permitted the jury to make of evidence derived from the prior criminal proceeding. 181 F. 2d 70 (1950). We granted certiorari, limiting review to important questions as to the scope of § 5 of the Clayton Act. 340 U. S. 808 (1950), rehearing denied 340 U. S. 894 (1950).

I.

The relevant facts as to the criminal prosecution against respondents may be stated briefly. The charge of the indictment was summarized on appeal as follows:

". . . paragraph 34 charges . . . a conspiracy to restrain unduly the interstate trade and commerce in General Motors automobiles. Paragraph 35 states that the purpose of the defendants was to monopolize and control the business of financing the trade and commerce in new and used General Motors automobiles. Paragraph 70 alleges that dealers have com-

---

[3] 38 Stat. 731, 15 U. S. C. § 16.

plied with the defendants' coercive plan in order to save substantial investments in their businesses, paragraph 71 states that the effect of the conspiracy has been to restrain and burden unreasonably the interstate trade and commerce in General Motors automobiles, and paragraph 72 is a restatement of paragraph 34.

"The specific conduct embraced within the illegal concert of action is described in paragraphs 36 to 67 of the indictment . . . :  (1) Requiring dealers to promise to use GMAC exclusively as a condition to obtaining a franchise for the sale, transportation and delivery of automobiles; (2) Making contracts for short periods and cancellable without cause, canceling or threatening to cancel such contracts unless GMAC facilities are used; (3) Discriminating against dealers not using GMAC by refusing to deliver cars when ordered, delaying shipment and shipping cars of different number, model, color and style; (4) Compelling dealers to disclose how they finance their wholesale purchases and retail sales, examining and inspecting dealers' books and accounts in order to procure this information, and requiring dealers to justify their using other financing media; (5) Giving special favors to dealers using the wholesale and retail facilities of GMAC; (6) Granting special favors to GMAC which are denied to other discount companies; (7) Giving dealers a rebate from the GMAC finance charge paid by the retail purchaser, in order to induce use of GMAC financing facilities; and (8) Compelling dealers to refrain from using other finance companies by all other necessary, appropriate or effective means." [4]

---

[4] *United States* v. *General Motors Corp.*, 121 F. 2d 376, 383 (C. A. 7th Cir. 1941).

The criminal case was submitted to the jury with instructions that the Government need not prove all of some twenty-six acts alleged in the indictment as the means of effecting the conspiracy. The jury rendered a general verdict finding the corporate defendants guilty and acquitting all individual defendants. Maximum fines were assessed against each of the corporations. The Seventh Circuit Court of Appeals affirmed. *United States* v. *General Motors Corp.*, 121 F. 2d 376 (1941). This Court denied certiorari, 314 U. S. 618 (1941), rehearing denied 314 U. S. 710 (1941).

Among the almost 50 dealers and former dealers whose testimony the Government introduced in the criminal action was Fred Emich, who owned or controlled the corporations which are petitioners here. On the criminal appeal the Court of Appeals thus reviewed his testimony:

"Fred Emich was a Chevrolet dealer at Chicago, Illinois, from 1932 to 1936 and he owned his own finance company to facilitate his purchases and sales, a course of business conduct which displeased GMAC. He received unordered cars and trucks in 1933, and the city manager of Chevrolet informed him that shipment of unordered cars would cease as soon as he would give some of his time sales finance paper to GMAC. He gave GMAC around 10% of his business in 1934 and became acquainted with the visits of GMAC and Chevrolet representatives. The zone manager warned him at the 1935 contract renewal meeting to the effect that if he expected to continue as a Chevrolet dealer he had better use GMAC at least 50%. Again he experienced difficulties with Chevrolet. This time cars of wrong colors and models were shipped to him and unordered accessories in great quantities were forced upon him. In addition he was required to send blank checks to the factory before cars were shipped to him. He was told by

the GMAC representative that these problems would disappear if he used GMAC. In 1936 Emich was given his 'last warning,' the zone manager telling him that he was going to make an example of Emich for his failure to use GMAC. Not long thereafter Emich was cancelled as a dealer, and he appealed to the president of General Motors where he pleaded that in a period of four years he had done a gross business of around $3,000,000. The president of General Motors told him that he had been cancelled because he did not use GMAC, that it was the policy of the corporation to require dealers to use GMAC, and that if Emich would not agree to use GMAC it would be useless for the president of General Motors to discuss his reinstatement . . . ." [5]

## II.

In their complaint petitioners allege that respondents unlawfully conspired in restraint of interstate trade in General Motors cars; that the conspiracy so alleged is the same as that charged against respondents and of which they were convicted in the antecedent criminal action, a copy of the indictment therein being attached as an exhibit; that pursuant to this conspiracy respondents injured petitioners' businesses by one or more of the unlawful acts set forth in said indictment, more particularly by terminating or cancelling or threatening to terminate or cancel the dealer franchise contracts of Emich Motors, which had financed the purchase or sale of cars through U. S. Acceptance Corporation rather than through GMAC. Respondents deny any conspiracy; they admit cancellation of the franchises but assert that such action was justified by Emich Motors' failure to perform certain obli-

---

[5] *United States* v. *General Motors Corp.*, 121 F. 2d 376, 396 (C. A. 7th Cir. 1941).

gations thereunder, as well as its persistence in a course of conduct inimical to the interest of General Motors in promoting the sale of Chevrolet cars.

In order to establish their prima facie case under § 5, petitioners offered in evidence the six-volume record of testimony and exhibits in the criminal case. The court held it inadmissible as evidence for the jury, with certain exceptions not important here. However, over respondents' objection, the court admitted, as exhibits to go to the jury, the indictment, verdict and judgment of conviction in the criminal case.

In his instructions the trial judge summarized the criminal indictment, the complaint of petitioners, and respondents' answer. He then instructed that the

". . . judgment in the criminal proceedings . . . is admitted as evidence in this case as prima facie evidence that [respondents] did enter into an unlawful conspiracy in violation of the anti-trust laws . . . in the manner described in the indictment . . . ."

After explaining the term "prima facie evidence," the court then summarized § 5 of the Clayton Act and charged that

". . . it was not necessary for the government to prove all of the acts alleged in the separate sections of the indictment. . . . nor is it necessary for the plaintiffs to prove all the acts charged in the indictment for you to find that the conspiracy alleged did exist.

"The judgment in the criminal case was admitted in evidence in this case, pursuant to the law to which I have just referred, for the purpose of the plaintiff making a prima facie case against the defendants as to one of the issues of this case and only and solely for the purpose of defining, describing, and limiting the scope of the judgment on the verdict which was

entered in that case, namely, the conspiracy to violate the anti-trust laws.

"The burden is on the plaintiffs of establishing by a preponderance of the evidence that they were injured by the defendants pursuant to or in the course of a conspiracy and in order to recover damages for the cancellation of the Chevrolet franchises they must prove by a preponderance of the evidence *including the criminal judgment* that the defendants entered into a conspiracy to compel the use of General Motors Acceptance Corporation by agreeing among themselves, among other things, to cancel dealers who failed or refused to use General Motors Acceptance Corporation to a satisfactory extent and that the franchise of Emich Motors Corporation was cancelled by reason of and pursuant to said conspiracy and not because of the things alleged by defendants as the reasons for such cancellation, and to recover any damages for the failure of defendants to deliver any Chevrolet automobiles, plaintiffs must establish that defendants as part of the conspiracy agreed among themselves to withhold or delay delivery of automobiles to dealers who refused or failed to use the services of General Motors Acceptance Corporation to a satisfactory extent and that the defendants actively failed to deliver or delayed shipments of cars to plaintiffs pursuant to and as a part of said alleged conspiracy." (Emphasis supplied.)

The jury returned a verdict for petitioners which resulted in judgments for $1,236,000 treble damages. The court assessed $257,358.10 as costs and attorneys' fees.

The Court of Appeals concluded that under § 5 the criminal judgment was prima facie evidence "that defendants had been guilty of a conspiracy to restrain dealers' interstate trade and commerce in General Motors cars for the purpose of monopolizing the financing essential

to the movement of those cars." 181 F. 2d at 75. It approved the trial court's ruling as to the inadmissibility in evidence of the entire record of the criminal case, but criticized the use of the indictment as an exhibit to the complaint, as well as certain references to the indictment in the opening statement and closing argument of petitioners' counsel to the jury. It held that serious error was committed when the indictment was sent to the jury as an exhibit and the trial court "told the jury that it could look to it [the indictment] to ascertain the *means* and the *acts* committed in furtherance of the conspiracy . . . ." The court observed that "it was unnecessary for the Government to prove . . . any of the acts or means, except for the purpose of establishing venue, in order for the jury in the criminal proceeding to find defendants guilty," and that "such acts and means are not to be considered as established by the finding of guilt." It concluded that the use of the indictment as evidence was aggravated by the instruction of the trial judge last quoted and italicized in part, *supra,* p. 565.

### III.

The issue we must determine, as defined in our order granting review, is "whether the Court of Appeals erred in construing § 5 of the Clayton Act . . . as not permitting: (*a*) the admission in the instant case of the indictment in the antecedent criminal case against respondents, nor (*b*) the judgment therein to be used as evidence that the conspiracy of which respondents had been convicted occasioned Emich Motors' cancellation."

In considering the application of § 5 in this case we are confronted with five differing interpretations. The broadest construction is urged by petitioners who contend that the criminal judgment is prima facie evidence that Emich Motors' franchises were cancelled pursuant to the unlawful conspiracy, and that the entire record in the

criminal case should be admissible in this action. The view of the trial judge differs only in that he would not permit the record in the criminal case, beyond the indictment, verdict and judgment, to go to the jury. The United States as *amicus curiae* takes a more contracted position, urging in its brief that the judgment is prima facie evidence of the conspiracy and also of the performance of such acts in accomplishing it as the jury in the criminal case, in rendering a verdict of guilty, necessarily found to have occurred, the latter to be determined by the trial judge in the treble-damage suit from the entire record in the criminal case. In its view the trial court under appropriate instructions may submit the criminal pleadings to the jury in order to assist it in understanding the charge as to what was determined by the criminal conviction. The Court of Appeals construes the section still more narrowly, holding the judgment prima facie evidence only of conspiracy by respondents. It concludes that none of the record in the criminal case should be exhibited to the jury, although the trial judge may examine it "as an aid in determining or defining the issues presented by the earlier case . . . ." 181 F. 2d at 76. Finally, respondents contend that the indictment charged a single conspiracy to perform some twenty-six different acts; that since the Government did not offer evidence to support all of the acts and was required to prove only one of them, it is impossible upon a general verdict of guilty to determine on which of the various acts the jury based its verdict; that consequently the judgment has no relevance here.

## IV.

Section 5 of the Clayton Act was adopted in response to a recommendation by President Wilson that Congress "agree in giving private individuals . . . the right to found their [antitrust] suits for redress upon the facts

and judgments proved and entered in suits by the Government where the Government has . . . sued the combinations complained of and won its suit . . . ." 51 Cong. Rec. 1964. Congressional reports and debates on the proposal which ultimately became § 5 reflect a purpose to minimize the burdens of litigation for injured private suitors by making available to them all matters previously established by the Government in antitrust actions. See H. R. Rep. No. 627, 63d Cong., 2d Sess. 14; S. Rep. No. 698, 63d Cong., 2d Sess. 45; 51 Cong. Rec. 9270, 9490, 13851. The intended application and extent of such evidentiary benefits is not revealed by legislative materials, except that they should follow equally from prior criminal prosecutions and equity proceedings by the Government. By its terms, however, § 5 makes a prior final judgment or decree in favor of the United States available to a private suitor as prima facie evidence of "all matters respecting which" the judgment "would be an estoppel" between the defendants and the United States. We think that Congress intended to confer, subject only to a defendant's enjoyment of its day in court against a new party, as large an advantage as the estoppel doctrine would afford had the Government brought suit.

The evidentiary use which may be made under § 5 of the prior conviction of respondents is thus to be determined by reference to the general doctrine of estoppel. As this Court has observed, that "principle is as applicable to the decisions of criminal courts as to those of civil jurisdiction." *Frank* v. *Mangum,* 237 U. S. 309, 334 (1915); *Sealfon* v. *United States,* 332 U. S. 575, 578 (1948). It is well established that a prior criminal conviction may work an estoppel in favor of the Government in a subsequent civil proceeding. *United States* v. *Greater New York Live Poultry Chamber of Commerce,* 53 F. 2d 518 (S. D. N. Y. 1931), affirmed *sub nom.*

*Local 167* v. *United States,* 291 U. S. 293 (1934); *Farley* v. *Patterson,* 166 App. Div. 358, 152 N. Y. Supp. 59 (1915); see *State* v. *Adams,* 72 Vt. 253, 47 A. 779 (1900); 2 Freeman, Judgments (5th ed. 1925), § 657. Such estoppel extends only to questions "distinctly put in issue and directly determined" in the criminal prosecution. See *Frank* v. *Mangum, supra,* at 334; *United States* v. *Meyerson,* 24 F. 2d 855, 856 (S. D. N. Y. 1928). In the case of a criminal conviction based on a jury verdict of guilty, issues which were essential to the verdict must be regarded as having been determined by the judgment. Cf. *Commonwealth* v. *Evans,* 101 Mass. 25 (1869). Accordingly, we think plaintiffs are entitled to introduce the prior judgment to establish prima facie all matters of fact and law necessarily decided by the conviction and the verdict on which it was based.

The difficult problem, of course, is to determine what matters were adjudicated in the antecedent suit. A general verdict of the jury or judgment of the court without special findings does not indicate which of the means charged in the indictment were found to have been used in effectuating the conspiracy. And since all of the acts charged need not be proved for conviction, *United States* v. *Socony-Vacuum Oil Co.,* 310 U. S. 150 (1940), such a verdict does not establish that defendants used all of the means charged or any particular one. Under these circumstances what was decided by the criminal judgment must be determined by the trial judge hearing the treble-damage suit, upon an examination of the record, including the pleadings, the evidence submitted, the instructions under which the jury arrived at its verdict, and any opinions of the courts. *Sealfon* v. *United States, supra;* cf. *Oklahoma* v. *Texas,* 256 U. S. 70 (1921).[6]

---

[6] See also McLaren, The Doctrine of Res Judicata as Applied to the Trial of Criminal Cases, 10 Wash. L. Rev. 198, 200 (1935).

In the criminal case it was the Court of Appeals' undisturbed determination, which we accept here, that the jury verdict was firmly rooted in a finding of coercive conduct on the part of respondents toward General Motors dealers to force the use of GMAC facilities. That court, in commenting on the sufficiency of the evidence, said that "the jury finding of coercion is supported by the evidence. The coercive practices were many and varied . . . and directly aimed to compel dealer-purchasers to use GMAC in financing the wholesale purchase and retail sale of General Motors cars. . . . Undoubtedly the jury was warranted in attaching the coercion label to the action thus adopted by the appellants." *United States* v. *General Motors Corp.*, 121 F. 2d 376, 397 (C. A. 7th Cir. 1941). The same conclusion was reached by this Court in *Ford Motor Co.* v. *United States*, 335 U. S. 303 (1948), where it was required for another purpose to determine what was necessarily found by the jury verdict in the criminal proceeding against General Motors and GMAC.[7]

We are, therefore, of opinion that the criminal judgment was prima facie evidence of the general conspiracy for the purpose of monopolizing the financing of General Motors

---

[7] In the *Ford* case it was stated that the "plain effect" of the instructions in the criminal action against General Motors and GMAC was "to draw a line between such practices as cancellation of a dealer's contract, or refusal to renew it, or discrimination in the shipment of automobiles, as a means of influencing dealers to use GMAC, all of which fall within the common understanding of 'coercion,' and other practices for which 'persuasion,' 'exposition' or 'argument' are fair characterizations. . . . The trial judge used the word 'coercion' to summarize practices which, if the jury found them to exist, would call for a verdict against General Motors. He used the words 'persuasion,' 'exposition' and 'argument' to describe conduct which, in common usage, is not 'coercion' and therefore would not support such a verdict. Nothing in other portions of the judge's charge erases or blurs this line of distinction." 335 U. S. at 316–319. Relevant portions of the instructions are set forth at p. 316, n. 3.

cars, and also of its effectuation by coercing General Motors dealers to use GMAC. To establish their prima facie case it therefore was necessary for petitioners only to introduce, in addition to the criminal judgment, evidence of the impact of the conspiracy on them, such as the cancellation of their franchises and the purpose of General Motors in cancelling them, and evidence of any resulting damages.[8] From this it follows that the Court of Appeals was in error when it held that the judgment was prima facie evidence only of a conspiracy by respondents.

What issues were decided by the former Government litigation is, of course, a question of law as to which the court must instruct the jury. It is the task of the trial judge to make clear to the jury the issues that were determined against the defendant in the prior suit, and to limit to those issues the effect of that judgment as evidence in the present action. As to the manner in which such explanation should be made, no mechanical rule can be laid down to control the trial judge, who must take into account the circumstances of each case. He must be free to exercise "a well-established range of judicial discretion." *Nardone* v. *United States,* 308 U. S. 338, 342 (1939). He is not precluded from resorting to such portions of the

---

[8] In deciding that under § 5 the criminal judgment against respondents may be admitted as prima facie evidence only of the fact of conspiracy and of the use of coercive methods in carrying it out, we do not intend to preclude its admission for such other purposes, apart from § 5, as the general law of evidence may permit. Petitioners contend that the judgment may be considered by the jury as evidence of respondents' intention in cancelling the Emichs' franchises. Cf. Wigmore, Evidence (3d ed. 1940), §§ 302–304; *American Medical Association* v. *United States,* 76 U. S. App. D. C. 70, 87–89, 130 F. 2d 233, 250–252 (C. A. D. C. Cir. 1942), affirmed 317 U. S. 519 (1943). Whether this contention is correct and, if so, whether such evidence would establish prima facie an illegal motive are questions beyond the scope of our present review.

record, including the pleadings and judgment, in the antecedent case as he may find necessary or appropriate to use in presenting to the jury a clear picture of the issues decided there and relevant to the case on trial. Cf. *Eastman Kodak Co.* v. *Southern Photo Material Co.*, 295 F. 98, 101 (C. A. 5th Cir. 1923), affirmed 273 U. S. 359 (1927). A similar discretion must be exercised in approving the attachment of a copy of the indictment as an exhibit to the complaint.

In summary the trial judge should (1) examine the record of the antecedent case to determine the issues decided by the judgment; (2) in his instructions to the jury reconstruct that case in the manner and to the extent he deems necessary to acquaint the jury fully with the issues determined therein; and (3) explain the scope and effect of the former judgment on the case at trial. The court may, in the interest of clarity, so inform the jury at the time the judgment in the prior action is offered in evidence; or he may so instruct at a later time if, in his discretion, the ends of justice will be served.

The case is remanded to the Court of Appeals with directions to modify its judgment to conform with this opinion.

*It is so ordered.*

MR. JUSTICE MINTON took no part in the consideration or decision of this case.