**UNITED STATES of America,**
**Plaintiff,**

v.

**STANDARD ULTRAMARINE AND COLOR COMPANY, American Cyanamid Company, The Sherwin-Williams Company, Imperial Paper and Color Corporation, Sterling Drug, Inc. and Holland Color & Chemical Company, Defendants.**

United States District Court
S. D. New York.

Dec. 16, 1955.

168

Burke & Burke, New York City, for defendant Standard Ultramarine And Color Co.

Donovan Leisure Newton & Irvine, New York City, for defendants American Cyanamid Co. and Imperial Paper & Color Corp. Ralstone R. Irvine, Walter R. Mansfield, Richard Y. Holcomb, New York City, of counsel.

Alexander & Green, New York City, for defendant The Sherwin-Williams Co. James D. Ewing, New York City, of counsel.

Cahill, Gordon, Reindel & Ohl, New York City, for defendant Sterling Drug Co., Inc. Mathias F. Correa and Jerome Doyle, New York City, of counsel.

Townley, Updike, Carter & Rodgers, New York City, for defendant Holland Color & Chemical Co. A. Leslie Hodson, Bernard E. Harrold, Chicago, Ill., Andrew L. Hughes, New York City, of counsel.

Thomas B. Gilchrist, Jr., Chief Asst. U. S. Atty., New York City, for United States. Stanley N. Barnes, Asst. Atty. Gen., Marcus A. Hollabaugh, Philip L. Roache, Jr., William W. Rayner, Attys., Dept. of Justice, Washington, D. C., of counsel.

WEINFELD, District Judge.

This is a motion by defendants for leave to withdraw previous pleas of not guilty and now to enter pleas of nolo contender.[1] The Government opposes the application.

The defendants, six corporations, are charged in a single-count indictment with conspiracy to violate the Sherman Anti-Trust Act.[2] They are manufac-

1. Rule 11, Federal Rules of Criminal Procedure, 18 U.S.C.A.

2. 15 U.S.C.A. § 1.

turers of dry colors which are used in the paint, printing inks, paper, plastic and many other industries. The indictment charges that over a nine-year period the defendants combined and conspired: (a) to fix and maintain prices; (b) to adopt uniform and non-competitive methods of pricing; and (c) to adopt uniform and non-competitive terms of sale. It is alleged that the defendants sold $30,000,000 of dry colors in 1954, representing approximately 37½% of the $80,000,000 volume of business in that year in the United States.

The defendants urge acceptance of the plea on the ground that it is in the interest of the sound administration of justice. Firstly, they claim that the plea of nolo contendere fully vindicates the public interest since it is tantamount to a plea of guilty for the purposes of the case and permits the imposition of the same fine as may be imposed following a protracted and expensive trial, assuming a verdict of guilty. Secondly, if the plea is not accepted they will of necessity defend the prosecution rather than plead guilty,[3] and thus burden the Court with a lengthy trial, adding to an already congested calendar and depriving other litigants of prompter trials.[4] Lastly they assert the plea conforms to congressional policy as enunciated in the Clayton Act and in the Federal Rules of Criminal Procedure.

While the defendants' arguments are couched in terms of concern for the public interest, acceptance of the plea would carry with it definite and incalculable advantages to the defendants. The plea would avoid trial with its attendant expense and adverse publicity in the event of conviction. Further it would, and this the defendants acknowledge as an overriding consideration, eliminate the impact of § 5 of the Clayton Act[5] which would follow in the event of a conviction, thereby reducing the risks to them of private treble damage suits. And it is exactly for this reason that the Government contends that a plea of nolo contendere in this case would defeat rather than promote the public interest. This

3. The defendants state that a guilty plea, even were they so minded, presents no alternative since it has not been authoritatively determined whether such a plea likewise avoids the impact of § 5 of the Clayton Act, 15 U.S.C.A. § 16. Twin Ports Oil Co. v. Pure Oil Co., D.C.D. Minn., 26 F.Supp. 366, 372. But cf. United States v. Jones, D.C.S.D.Cal., 119 F.Supp. 288, 290. Thus they say that even should they succeed in a test of this issue in subsequent private litigation, they still will have lost a principal benefit they seek to gain by the termination of this proceeding. Further, they suggest that conviction following trial presents less hazard to them than a ;guilty plea. Here the contention is that a verdict of guilty would require the Court in a subsequent trial to define and limit the issues which were determined in the prior criminal prosecution, Emich Motors Corp. v. General Motors Corp., 340 U.S. 558, 71 S.Ct. 408, 95 L.Ed. 534, whereas a plea of guilty may be admissible as a general admission against the defendant entering the plea.

4. Much misinformation has been broadcast recently concerning the alleged calendar congestion in this District. While the Court does have the greatest volume of pending civil cases of any District in the country, 17.5% with 8% of the Judges, a trial may be currently had where litigants are actually ready from the date of filing of the note of issue as follows: non-jury case, 2 months; jury personal injury case, 10 months; all other jury cases, 4 months. Also see Quarter Annual Report of Director of the Administrative Office of the United States Courts, November 15, 1955, p. 17.

5. "A final judgment or decree rendered in any criminal prosecution or in any suit or proceeding in equity brought by or on behalf of the United States under the antitrust laws to the effect that a defendant has violated said laws shall be prima facie evidence against such defendant in any suit or proceeding brought by any other party against such defendant under said laws as to all matters respecting which said judgment or decree would be an estoppel as between the parties thereto: Provided, This section shall not apply to consent judgments or decrees entered before any testimony has been taken." 15 U.S.C.A. § 16.

reflects the hard core of the issue presented to the Court.

 Under § 5 of the Clayton Act a private litigant may introduce a prior final criminal judgment and equity decree entered against a defendant in Government antitrust suits as prima facie evidence of all matters necessarily determined by the judgment or decree.[6] But a nolo contendere plea is exempt from the application of § 5.[7] Although equivalent to a plea of guilty in the particular case,[8] a defendant is not estopped in any other action to deny the facts upon which the prosecution was based. Further, it cannot be used as an admission in a civil case grounded upon the same facts.[9]

It is true that in the event of a long trial the fine which might be imposed if there were a conviction would be no greater than under a nolo contendere plea—a maximum of $5,000.[10] It is also true that the Government would be saved the expense of further prosecution and a protracted trial avoided. But does payment of a fine and the elimination of a trial and its cost really vindicate the public interest? This in turn poses the basic question: whether under the circumstances of this case it is in the public interest to deprive private parties of the benefits[11] of the prima facie case under § 5 if the defendants should be found guilty upon trial.

We need not tarry long on the issue of the elimination of expense to the Government. It has already been put to great expense in the investigation and preparation of the matter to date. The fact that it was presented to a grand jury suggests the violations charged were deemed by the Attorney General to be of a "flagrant" nature.[12] The suggestion that the Government forego its right, and indeed its duty, to uphold the integrity of our laws because of the heavy cost of prosecution falls of its own weight. Cost of enforcement in terms of manpower and money is of little consequence when necessary to assure decent respect for, and compliance with, our laws.

We pass to the fundamental issue which is at the heart of the controversy. The antitrust statutes, as has so often been emphasized, are aimed at assuring that our competitive enterprise system shall operate freely and competitively. They seek to rid our economy of monopolistic and unreasonable restraints. Upon their vigorous and constant enforcement depends the economic, political and social well-being of our nation. The concept that antitrust violations really are "minor" and "technical" infractions, involve no wrongdoing, and merely constitute "white collar" offenses, has no place in the administration of justice.[13] Ever since the passage in 1890

6. Emich Motors Corp. v. General Motors Corp., 340 U.S. 558, 71 S.Ct. 408, 95 L.Ed. 534.

7. Twin Ports Oil Co. v. Pure Oil Co., D.C. D.Minn., 26 F.Supp. 366; Barnsdall Refining Corp. v. Birnamwood Oil Co., D.C. E.D.Wis., 32 F.Supp. 308.

8. Hudson v. United States, 272 U.S. 451, 47 S.Ct. 127, 71 L.Ed. 347; United States v. Norris, 281 U.S. 619, 50 S.Ct. 424, 74 L.Ed. 1076;

9. A. B. Dick Co. v. Marr, D.C.S.D.N.Y., 95 F.Supp. 83, 101.

10. Parenthetically it should be pointed out that Congress recently increased the fine for Sherman Act criminal offenses from $5,000 to $50,000. Ch. 281, Public Law 135 (1955), approved July 7, 1955, U.S. Code Cong. and Admin. News at p. 307, 15 U.S.C.A. §§ 1–3.

11. The benefit of the prima facie provision of § 5 has been questioned and some have held it more illusory than real. Cf. Note, Clayton Act, Section 5: Aid to Treble Damage Suitors?, 61 Yale L.J. 417; Comment, Antitrust Enforcement By Private Parties, 61 Yale L.J. 1010, 1040; Note, Government Judgments as Evidence in Private Anti-Trust Proceedings: Section 5 of the Clayton Act, 46 Ill.L.Rev. 765.

12. Cf. Report of the Attorney General's National Committee To Study the Antitrust Laws, pp. 349–350.

13. See Sutherland, White Collar Crime, 8–13, 56–88; also Stedman, The Committee's Report: More Antitrust Enforcement—or Less?, 50 Northwestern U.L. Rev. 317–318.

of the Sherman Anti-Trust Act, referred to by Mr. Chief Justice Hughes as a "charter of freedom," [14] Congress has shown constant and increasing concern over practices which destroy economic competition.

■ Congress, to secure effective enforcement of the antitrust laws, provided both criminal and civil sanctions through governmental agencies.[15] But it was not content to rely solely upon official action. It sought to encourage individuals to aid in the policing.[16] And to help achieve the broad objectives of the Act the treble damage action was authorized in favor of those who had been injured by the condemned conduct. Its purpose was not only the redress of private wrong but also the protection of the public interest.[17] And "Congress intended to use private self-interest as a means of enforcement * * * when it gave to any injured party a private cause of action * * *."[18] Another purpose in permitting an injured party to recover threefold his actual damage was that substantial verdicts against the wrongdoer

would constitute punitive sanctions—to act as a deterrent against a repetition of the offense and to serve as a warning to potential violators.

But even this auxiliary policing method did not altogether fulfill its purpose.[19] The years that followed the enactment of the treble damage provision revealed, that few private litigants had the resources or staying power to conduct a protracted and difficult antitrust case. And those who were able and willing to assume the staggering cost of litigation were frequently worn out by their opponents by sheer attrition. The disparate situation between victim and violator was sharply pointed out by President Wilson [20] when he urged Congress; to enact what ultimately became § 5 of the Clayton Act. A reading of the interesting debates which followed shows that the unmistakable purpose of the Congress in enacting § 5 in response to the Presidential message was "to minimize the burdens of litigation for injured private suitors by making available to them all matters previously es-

14. Appalachian Coals, Inc., v. United States, 288 U.S. 344, 359, 53 S.Ct. 471, 474, 77 L.Ed. 825.

15. 15 U.S.C.A. §§ 1 and 4.

16. See Note, Clayton Act, Section 5: Aid to Treble Damage Suitors?, 61 Yale L.J. 417; McConnell, The Treble Damage Action, 1950 Univ. of Ill. Law Forum, 659, 665.

17. D. R. Wilder Mfg. Co. v. Corn Products Refining Co., 236 U.S. 165, 174, 35 S.Ct. 398, 59 L.Ed. 520; Trebuhs Realty Co. v. News Syndicate Co., D.C.S.D.N.Y., 107 F.Supp. 595, 599; Fanchon & Marco v. Paramount Pictures, Inc., D.C.S.D. Cal., 100 F.Supp. 84, 88; Comment, Proof Requirements in Anti-Trust Suits: The Obstacles to Treble Damage Recovery, 18 U. of Chi.L.Rev. 130, 138.

18. Bruce's Juices, Inc., v. American Can Co., 330 U.S. 743, 751–752, 67 S.Ct. 1015, 1019, 91 L.Ed. 1219; See also Quemos Theatre Co. v. Warner Bros. Pictures, Inc., D.C.D.N.J., 35 F.Supp. 949, 950.

19. See Hamilton & Till, Antitrust in Action, pp. 82–83 (TNEC Monograph 16, 1940).

20. Special Message to the Congress, January 20, 1941: "I hope that we shall agree in giving private individuals who claim to have been injured by those processes the right to found their suits for redress upon the facts and judgments proved and entered in suits by the Government where the Government has upon its own initiative sued the combinations complained of and won its suit. * * * It is not fair that the private litigant should be obliged to set up and establish again the facts which the Government has proved. He can not afford, he has not the power, to make use of such processes of inquiry as the Government has command of. Thus shall individual justice be done while the processes of business are rectified and squared with the general conscience." 51 Cong.Rec. 1964. As to the use of Presidential messages to aid in determining the general purpose of statutes enacted in response to such request, see New York Central R. Co. v. Winfield, 244 U.S. 147, 149–150, 37 S.Ct. 546, 61 L. Ed. 1045; Johnson v. Southern Pacific Co., 196 U.S. 1, 19, 25 S.Ct. 158, 49 L. Ed. 363; United States v. Sears Roebuck & Co., D.C.S.D.N.Y., 111 F.Supp. 614, 619.

tablished by the Government in anti-trust actions." [21] The defendants urge that there is no obligation upon the Government to assist or encourage litigants.[22] But a fair reading of the debates and the Committee Reports indicates that such was the very purpose of the clause.[23] It was fashioned as a powerful weapon to aid private litigants in their suits against antitrust violators by reducing the almost prohibitive costs and staggering burdens of such litigation in making available to him the results of the Government's successful action, whether an equity suit or a criminal prosecution.[24] And the hoped for by-product of the benefit to a plaintiff was increased law enforcement.

■ It is against this legislative background that defendants' motions must be considered. The various District Court rulings cited by the parties denying or granting motions for leave to plead nolo contendere cannot serve as precedents and are of little aid in the matter. In deciding whether the public interest will be better served by acceptance or rejection of the plea each case must be governed by its own facts. Some, but by no means all, the factors to be considered, or at least those which this Court deems relevant, are: the nature of the claimed violations; how long persisted in; the size and power of the defendants in the particular industry; the impact of the condemned conduct upon the economy; whether a greater deterrent effect will result from conviction rather than from acceptance of the plea —obviously these will vary from case to

case. Another circumstance to be given relative, but by no means controlling weight, is the view of the Attorney General. As chief enforcement officer his judgment, that from an over-all national viewpoint the prospect of conviction rather than a nolo plea will more readily vindicate the public interest, should be considered.

■ The violations here are alleged to have extended over a nine-year period; the offense charged is price fixing, a per se violation, deemed one of the more serious infractions of the law.[25] The volume of business of the defendants is substantial: $30,000,000 out of a total national sales volume of $80,000,-000.

I am satisfied, after taking into account all significant factors, the motion should be denied. The balance, if the defendants were permitted to plead nolo contendere, would be disproportionately in their favor without countervailing benefit to the public interest. Such a plea, apart from yielding to a defendant the decided advantages already noted, gains for him the tremendous advantage of depriving parties allegedly injured by his conduct of the benefits of the prima facie case under § 5. If violators may expiate their wrongdoing by payments of token fines—by accepting the proverbial "slap on the wrist"—and to boot, avoid the impact of § 5, then a powerful deterrent to law violation has been removed. Government officials have readily acknowledged that the financial pinch on an antitrust defendant achieved

21. Emich Motors Corp. v. General Motors Corp., 340 U.S. 558, 568, 71 S.Ct. 408, 95 L.Ed. 534.

22. Brief of Defendant Holland Color & Chemical Co. p. 13.

23. 51 Cong.Rec. 13851–13858, 16046–16047, H.R.Rep. No. 627, 63rd Cong., 2d Sess. 14; Sen.Rep. No. 698, 63rd Cong., 2d Sess. 10, 45.

24. It may be noted that one branch of the Congress felt so strongly about the matter that as originally passed by it,

the bill provided that a decree in favor of the government should be conclusive against a defendant in a subsequent action by a private litigant. However, serious constitutional doubts were raised in the Senate and the bill was finally passed in its present form. 51 Cong.Rec. 16276.

25. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 224, note 59, 60 S. Ct. 811, 845, 84 L.Ed. 1129: "They [price fixing agreements] are all banned because of their actual or potential threat to the central nervous system of the economy."

through the treble damage action is a "substantial deterrent".[26]

If a defendant in fact has violated the antitrust laws it would not be in the public interest that he have the aid of the Court to add to the admittedly heavy burden of the victim seeking redress, thereby decreasing the prospect of private treble damage recovery with its punitive value and possible deterrent effect. Instead of the heavy burden being lightened it would be rendered more difficult.[27] Instead of the victim having, as Congress intended, "as large an advantage as the estoppel doctrine would afford had the Government brought suit"[28] the advantage would go to the wrongdoer. Such a course not only fails to carry out the congressional purpose but would tend to diminish rather than increase respect for law. Accordingly it should not have the sanction of the Court.

The defendants suggest no consideration which would not be present in any other antitrust proceeding for the acceptance of the nolo plea. Absent compelling factors, to grant the motion is virtually to rule that a defendant in an antitrust proceeding is entitled to plead nolo contendere as a matter of right. The discretion of the Court should be exercised favorably only when special considerations are present.

The defendants urge that Congress, by the proviso in § 5 that it "shall not apply to consent judgments or decrees entered before any testimony has been taken", intended to encourage defendants to capitulate to the Government charges without a trial whether the proceeding was criminal or civil. Hence, they say that it would conform to congressional policy for the Court to give weight to this inducement and permit them to enter the nolo plea. It is far from clear, despite judicial authority supporting the view,[29] that the exception in § 5 was intended to apply to criminal prosecutions as well as to equity suits.[30] As has been recognized, a "consent judgment or decree" in a criminal prosecution is an anomaly.[31]

The use of the nolo plea came into extended use in antitrust suits partly because of the uncertainty that a guilty plea would in fact gain for the

26. In 1951 the Assistant Attorney General in Charge of the Anti-Trust Division, Department of Justice, testified: "[W]e have for the first time since the history of the enactment of the Clayton Act and the Sherman Anti-Trust Act, begun to see the development of private litigation under the triple damage statute, which is of substantial help * * *. It is a substantial deterrent in whatever area the Government has decrees, and the effectiveness of this is for the first time being felt. We begin to feel that we have some companion element of assistance in this which we never had before." Hearings before the Subcommittee on Study of Monopoly Power of the Committee on the Judiciary on H.R. 3408, 81st Cong., 2d Sess., pt. 3, p. 15. However, in previous years there were those who questioned the efficacy of the treble damage award as a deterrent. See Comment, Fifty Years of Sherman Act Enforcement, 49 Yale L.J. 284, 299.

27. Cf. "In providing for treble damages under the antitrust laws, Congress had clearly in mind the extreme difficulty of maintaining a private suit under those laws. The experience over the past 70 years suggests that Congress underestimated the enormity of the task assumed by the plaintiff seeking threefold damages. * * * The initial problem merely of proving their existence is one which few persons can afford to undertake." Donovan & Irvine, Proof of Damages Under the Anti-Trust Law, 88 Univ. of Pa.L.Rev. 511, 524–525. See also Hamilton & Till, Anti-Trust in Action, 83 (TNEC Monograph 16, 1940).

28. Emich Motors Corp. v. General Motors Corp., 340 U.S. 558, 568, 71 S.Ct. 408, 414, 95 L.Ed. 534.

29. Twin Ports Oil Co. v. Pure Oil Co., D.C.D.Minn., 26 F.Supp. 366, 376.

30. See debates between Senators Reed and Walsh, 51 Cong.Rec. 15823–15824 and Senators Norris and Borah, 51 Cong.Rec. 16046–16047.

31. Twin Ports Oil Co. v. Pure Oil Co., D.C.D.Minn., 26 F.Supp. 366, 371; Lenvin & Meyers, Nolo Contendere: Its Nature and Implications, 51 Yale L.J. 1255, 1267.

defendant the benefit of the exception under § 5; it of course also served to eliminate other hazards and possible consequences to a defendant.[32] Its use for "practical purposes"[33] to avoid the issues inherent in a guilty plea does not necessarily reflect congressional purpose to extend the exemption provision of § 5 to defendants in criminal antitrust suits. In any event, the short answer to the defendants' contention is that Rule 11 of the Federal Rules of Criminal Procedure vests the Court with discretion to accept or reject the tendered plea. Had Congress intended to grant a defendant an absolute right to avert the effects of the prima facie case in a criminal prosecution, as in an equity suit, it could readily have granted him, under Rule 11, the right to plead nolo contendere— just as a defendant has the right to confess judgment in answer to a Government civil antitrust suit without the consent of the Court.

But one case, recently decided in this District and pressed vigorously by the defendants, requires comment.[34] There defendants' motion to plead nolo contendere was granted over the objection of the Attorney General. In that case, however, as pointed out by Judge Sugarman, the Government simultaneously with the filing of the indictment commenced a companion civil suit based upon the same charges, which the defendants are contesting, and in the event the Government is successful the decree will be available to private parties. In the instant case no such civil suit was instituted.

■■ Finally, the Court states, perhaps unnecessarily, that the rejection of the plea is no indication that it has any view as to the defendants' guilt or innocence. The motion is decided on public policy considerations. These defendants, as all defendants have the benefit of the presumption of innocence, which remains in their favor unless the Government shall sustain its burden of establishing guilt beyond a reasonable doubt.

The motion is denied.

32. Under the general law of evidence, a guilty plea may be admitted in other trials as an admission against the defendant entering the plea. 130 A.L.R. 690, 699; 18 A.L.R.2d 1287, 1307. Further, in any civil action by the Government against the defendant, the doctrine of res judicata may apply and the judgment entered upon the guilty plea become conclusive as to the facts alleged in the indictment. See, United States v. Wainer, 7 Cir., 211 F.2d 669; United States v. Bower, D.C.E.D.Tenn., 95 F.Supp. 19; United States v. Ben Grunstein & Sons Co., D.C.D.N.J., 127 F.Supp. 907; See also Local 167 of International Brotherhood of Teamsters, etc. v. United States, 291 U.S. 293, 298, 54 S.Ct. 396, 78 L.Ed. 804.

33. Proceedings of the Institute on Federal Rules of Criminal Procedure, N.Y.U. School of Law, Statement of Hon. G. Aaron Youngquist, p. 188: "It [plea of nolo contendere in Rule 11] was designed primarily to deal with the consequences of a plea of guilty in a criminal antitrust case in connection with a treble damage suit following it, and it was thought that for practical purposes it would be better to let a corporation, for instance, charged with the violation of the antitrust laws plead nolo contendere rather than to plead guilty because of the consequences that might follow."

34. United States v. Cigarette Merchandisers Ass'n, Inc., 136 F.Supp. 212.