**UNITED STATES of America,
Plaintiff,**

**v.**

**AMERICAN BAKERIES COMPANY
et al., Defendants.**

**Crim. No. 7656.**

United States District Court
W. D. Michigan, S. D.

June 4, 1968.

For opinion on reconsideration see D.C., 284 F.Supp. 871.

John Edward Burke, Dept. of Justice, Chicago, Ill., for plaintiff.

Warner, Norcross & Judd, Harold S. Sawyer, Grand Rapids, Mich., Covington & Burling, Gerald P. Norton, Washington, D. C., for defendants Continental Baking Co. and Ray W. Moore.

Cholette, Perkins & Buchanan, Grant J. Gruel, Grand Rapids, Mich., Hopkins, Sutter, Owen, Mulroy, Wentz & Davis, William I. Goldberg, Chicago, Ill., for defendant American Bakeries.

Wheeler, Upham, Bryant & Uhl, Gordon B. Wheeler, Grand Rapids, Mich., Kirkland, Ellis, Hodson, Chaffitz & Masters, Ronald J. Wilson, Washington, D. C., for defendants Rainbo Bread Co., Samuel A. McLaughlin, and Charles A. Stewart.

Glassen, Parr, Rhead & McLean, Lloyd D. Parr, Lansing, Mich., for Schafer Bakeries, Inc., Russell E. Kisor, Gase Baking Co. and Eugene J. Gase.

Dickinson, Wright, McKean & Cudlip, John A. Krsul, Jr., Detroit, Mich., for defendant Michigan Bakeries, Inc.

McCobb & Heaney, Bruce K. Carroll, Grand Rapids, Mich., for defendant Harold C. Overholt.

Hillman, Baxter & Hammond, Douglas W. Hillman, Grand Rapids, Mich., for defendant Norman V. Clexton.

Charles E. Hopfl, New York City, for defendants Ward Foods, Inc. and William J. Coughlin.

Luyendyk, Hainer & Karr, John D. B. Luyendyk, Grand Rapids, Mich., for defendants Grocers Baking Co. and L. S. Parsons.

Chadwell, Keck, Kayser, Ruggles & McLaren, David J. Gibbons, Chicago, Ill., for Koepplinger Bakery, Inc. and Robert Bohringer.

Edward L. Cobb, Jackson, Mich., for defendant Way Baking Co.

Varnum, Riddering, Wierengo & Christenson, F. William Hutchinson, Grand Rapids, Mich., for Roskam Baking Co. and Donald O. Roskam.

Paulson, Bennett, Palmer & Lewis, Robert A. Palmer, Kalamazoo, Mich., for

Dutch Treat Bakers, Inc. and Walter Henley, Jr.

Foster, Campbell, Lindemer & McGurrin, Richard B. Foster, Lansing, Mich., for defendant Michigan Bakers Association, Inc.

Goldstein, Judd & Gurfein, Edward Brodsky, New York City, for defendant Silvercup Bakeries, Inc.

Miller, Johnson, Snell & Cummiskey, Stephen C. Brandsdorfer, Grand Rapids, Mich., for defendant John H. Way, Sr.

## OPINION

FOX, District Judge.

This case arises upon the motions of several defendants, corporate and individual, for permission to change their pleas of not guilty to pleas of nolo contendere.

On October 4, 1967, a grand jury sitting in this district and division returned an indictment charging in substance that between January 1964 and October 1966, defendants had entered into and engaged in a conspiracy to fix prices and agree upon bids in violation of Section 1 of the Sherman Act. On December 11, 1967, the Government filed a companion civil case (Civil Action No. 5787), alleging the same offense charged in the indictment and requesting injunctive relief. This court, on stipulation, stayed the proceedings in the civil action pending disposition of the criminal charge.

Also on December 11, 1967, defendants moved that the indictment be dismissed because the grand jury had not been selected in accordance with the law. To avoid litigating this point, the Government moved to dismiss the indictment. The motion was granted, and the Government filed a new criminal action covering the matters alleged in the indictment. Defendants' motions for return of documents subpoenaed by the grand jury, suppression or impounding of transcripts of testimony before the grand jury and preclusion of the use by the Government of any information obtained through the

grand jury were taken under advisement by the court.

On February 15, 1968, defendants were arraigned and entered pleas of not guilty. Later the same day, certain defendants requested that they be permitted to change their pleas to nolo contendere. The Government opposed this request, as did the State of Michigan as amicus curiae.

The defendant bakeries may be easily divided into two groups, for purposes of analysis. The majors, Continental Baking Company, Rainbo Bread Company (a subsidiary of Campbell Taggart Associated Bakeries, Inc.), American Bakeries Company, and Ward Foods, Inc., operate in several states and have a net worth of over ten million dollars each. The independents, the remaining defendants, operate primarily within the State of Michigan and have net worths ranging from one and a half million dollars to one hundred thousand dollars.

The information charged defendants with "a hard-core price-fixing and bid rigging conspiracy," state-wide in scope, over at least two and a half years, involving bakery products sold in excess of two million dollars in wholesale sales. The Government opposes acceptance of the nolo contendere pleas because of the seriousness of the charges, the lack of deterrent value a judgment on nolo contendere would have, the time and money already expended by the Government in the case, and the possibility of substantial private treble damage actions. To this end, the State of Michigan has appeared as amicus to oppose acceptance of nolo contendere pleas because it would preclude the use of a judgment as prima facie evidence in a treble damage suit being contemplated by the State, which has purchased through various schools and other institutions baked goods well in excess of a million dollars.

The defendants argue that nolo contendere pleas have been, and should be accepted as a matter of course, unless there are very special circumstances

which are not present here. The independents argue further that if they must bear the heavy burden of antitrust litigation they may go out of business. The independents also claim that if they are guilty of antitrust violations, it is a result of pressure from the majors.

To evaluate these various arguments, it is necessary to inquire into the nature of the nolo contendere plea and its relation to the antitrust laws. To help in the enforcement of antitrust laws and to increase their deterrent effect, Section 4 of the Clayton Act (15 U.S.C. § 15) provided that persons injured by an antitrust violation could sue for treble damages. "The years that followed the enactment of the treble damage provision revealed that few private litigants had the resources or staying power to conduct a protracted and difficult antitrust case. And those who were able and willing to assume the staggering costs of litigation were frequently worn out by their opponents by sheer attrition." United States v. Standard Ultramarine & Color Co., 137 F.Supp. 167, 171 (S.D. N.Y.1955).

■ President Wilson asked Congress in a Special Message, January 20, 1914, to remedy this situation by allowing private persons to make use of the facts and judgments in government actions. 51 Cong.Rec. 1964. As a result, Congress enacted Section 5 of the Clayton Act (15 U.S.C. § 16), which allows final judgments or decrees rendered in a government action to be used as prima facie evidence against the same defendant in any subsequent private treble damage action. The purpose of Section 5, as shown in the President's message and the Congressional debate, was to increase the deterrent effect of treble damages by minimizing "the burdens of litigation for injured private suitors by making available to them all matters previously established by the Government in antitrust actions." Emich Motors Corp. v. General Motors Corp., 340 U.S. 558, 568, 71 S.Ct. 408, 413, 95 L.Ed. 534 (1950); H.R.Rep. No.627, 63d Cong. 2d Sess. 14 (1914);

S.Rep.No.698, 63d Cong. 2d Sess., 10, 45 (1914); 51 Cong.Rec. 9270, 9490, 13851, 16046 (1914).

■ There is, however, an important proviso to Section 5: "This Section shall not apply to consent judgments or decrees entered before any testimony has been taken * * *" A judgment entered upon a plea of nolo contendere has been held to fall within this proviso. As stated in Commonwealth Edison Co. v. Allis-Chalmers Mfg. Co., 323 F.2d 412, 414–415 (C.A.7, 1963), cert. den. 376 U.S. 939, 84 S.Ct. 794, 11 L.Ed. 659, "* * * [J]udgments entered on pleas of nolo contendere are within the proviso and thus are unavailable for the prima facie benefit of § 5(a). We agree with Judge Learned Hand's statement that such judgments are 'plainly * * * within the [exclusionary] proviso * * *' Pfotzer v. Aqua Systems, Inc., 162 F.2d 779, 784 (C.A.2, 1947)." See also City of Burbank v. General Elec. Co., 329 F.2d 825 (C.A.9, 1964); Barnsdall Refining Corp. v. Birnamwood Oil Co., 32 F.Supp. 308 (E.D.Wis., 1940).

■ Rule 11 of the Federal Rules of Criminal Procedure allows a defendant to "plead not guilty, guilty or, *with the consent of the court*, nolo contendere." (Emphasis supplied.) Thus, it is within the discretion of the court whether to allow the plea of nolo contendere, precluding the potential prima facie effect of any judgment which might be reached and consequently undermining the purpose of Section 5, or to reject the plea, forcing the parties to the time and expense of litigation.

■■ It should be emphasized that it is the duty of the court to hear and decide any request to plead nolo contendere. Some courts always reject this plea, on grounds that defendant is either guilty or not guilty; other courts accept the plea as a matter of course. But the fact that acceptance of the plea is discretionary does not mean that full consideration should not be given to any request to plead nolo. It is a plea authorized by

statute, just as are pleas of guilty and not guilty.[1]

■ The basic standard to apply in deciding whether to accept nolo contendere is the public interest. United States v. Jones, 119 F.Supp. 288 (S.D. Cal., 1954); United States v. Standard Ultramarine & Color Co., supra; United States v. Safeway Stores, 20 F.R.D. 451 (N.D.Tex., 1957).

■ The public interest is served by preserving the deterrent value of the antitrust laws. The plea of nolo contendere is traditionally a plea for mercy, and has the same effect in the case before the court as a plea of guilty. Hudson v. United States, 272 U.S. 451, 453–457, 47 S.Ct. 127, 71 L.Ed. 347 (1926); United States v. Norris, 281 U.S. 619, 50 S.Ct. 424, 74 L.Ed. 1076 (1930).

Today, however, it has become a face-saving device. The public does not attach the same stigma to nolo contendere pleas as it does to pleas of guilty or convictions after pleas of not guilty. (Note, Nolo Pleas in Antitrust Cases, 79 Harv. L.Rev. 1475, 1477 (1966); Task Force Report: Crime and Its Impact—An Assessment, the President's Commission on Law Enforcement and Administration of Justice (1967), at pages 110–111.) If nolo is merely a means by which "violators may expiate their wrongdoing by payments of token fines—by accepting the proverbial 'slap on the wrist'—and to boot, avoid the impact of § 5, then a powerful deterrent to law violation has been removed." United States v. Standard Ultramarine & Color Co., supra, 137 F. Supp. at 172.

■ For this reason, the court should look to each individual case to decide whether nolo contendere will provide a sufficient deterrent effect. The nature of the violations, how long they were persisted in, the size and power of defendants, prior antitrust violations of defendants, and impact of the condemned conduct on the economy, are all important factors in determining whether to allow pleas of nolo contendere in a specific case.

■ Another factor to be considered is whether the Government has also filed a companion civil case, which might provide the same prima facie effect as the criminal case. This is only one factor to be considered, however, and should not be considered controlling. There is little danger of double litigation of the criminal and civil claims if nolo is refused, since whichever side loses the criminal case usually concedes the civil case.

The greatest impact of acceptance or rejection of nolo contendere is in cases where private treble damage actions are likely. Some courts have argued that the existence of potential private actions is not relevant in ruling on nolo, because only the public and not private interest should be considered. United States v. Jones, supra; United States v. Safeway Stores, supra.

■ This view ignores the fact that treble damages serve public as well as private interests. D. R. Wilder Manufacturing Co. v. Corn Products Refining Co., 236 U.S. 165, 174, 35 S.Ct. 398, 59 L.Ed. 520 (1915); United States v.

[1] As Milton Handler said in an address before the Judicial Conference of the Sixth Circuit, May 24, 1968, entitled "Some Practical Problems in Current Antitrust Litigation:"

"My own view is that if there were no nolo plea, one would have to be invented. Its purpose is to provide an honorable means by which unnecessary criminal trials can be avoided without any impairment of the deterrent effect of reasonable and effective punishment. If the object of a prosecution is fully achieved, why should it not be possible to end the case without insisting upon a collateral admission benefitting the private suitor only? In my hierarchy of values, the needs of the prosecution and the interests of the courts in efficient criminal administration rise above the unneeded advantage of treble damage plaintiffs. As counsel for both plaintiffs and defendants, I can testify that the plaintiffs can well fend for themselves and that society will lose more than it will gain by the destruction of a useful instrument for the settlement of complex criminal cases." (Milton Handler is Professor of Law at Columbia University.)

Standard Ultramarine & Color Co., supra; Comment, Proof Requirements in Antitrust Suits: The Obstacles to Treble Damages, 18 U. of Chi.L.Rev. 130, 138 (1950). As discussed supra, Section 5 was enacted to help maximize the deterrent effect of treble damages.

▉ To routinely accept nolo pleas where there is high potential of a treble damage action would make a mockery of Section 5—any guilty defendant might avoid serious private actions by pleading the magic words. (Note, Nolo Pleas in Antitrust Cases, 79 Harv.L.Rev. 1475, 1483 (1966)). Thus, the existence of potential private actions should be an important consideration in deciding whether to accept nolo contendere pleas, since private actions are intended to help protect public interests.

▉ A final factor which should be considered is the impact on the economy of accepting or rejecting nolo. This consideration is particularly important in cases where the costs of litigation are high and may actually put one or more defendants out of business.

In applying all the factors mentioned to this case, the nature of the bakery industry in Michigan and elsewhere must be understood. The key feature of the Michigan market is the presence of four majors and eight independents. This is important because of the disparity in size between the majors and the independents. For example, the net worth of Campbell Taggart, one of the majors, is $80,000,000; the total net worth of the eight independents is $6,000,000, or approximately 6½% of the net worth of a single major company. It now becomes clear why both attorneys from the independents and the Government concluded that the independents do not control the price of bread and bakery products in Michigan.

Testimony contained in The Report of the Committee on the Judiciary, made by its Subcommittee on Antitrust and Monopoly, 86th Cong.2d Sess.1960, entitled Administered Prices—Bread (hereinafter cited as Report), reveals some startling information. The Committee concluded at page 91 that the majors have at one time or another employed seven forms of discrimination in the bread industry: "(1) provision of free bread and free fixtures; (2) stales 'clobbering;' (3) discounts and allowances; (4) use of secondary loaves in fighting brands; (5) money 'over, under, and through' the table; (6) selling heavier or better loaves of bread at the same price; and (7) product discrimination. The effects of these forms of discrimination on the independent baker whose market is invaded by the large firms have been a recurring theme through every account of the practices in the bread industry.

"In addition, however, these discriminating practices serve as highly effective tools for the Big Eight in still another way. They tend to prevent entry into monopolized markets by reducing expectations of potential profits in the monopolized market. The independent firm knows that by using these forms cf discrimination, the Big Eight can destroy the independent by draining away his meager capital."

An example of the plight of the independent is the case of Schafer Bakeries, Inc. On October 13, 1960, Judge Ralph Freeman of the Eastern District of Michigan signed an order under Section 236 dismissing the proceedings of a 77B bankruptcy action. Net sales from that date until now have been $80,000,000; profits were $258,000, which is slightly more than one-fourth of one per cent of sales, a very thin survival margin. And if any one of the seven discriminatory practices is effectively employed, the effect on Schafer could be fatal.

The Report makes it clear that wherever major companies in multiples invade a local market they control the price of bakery products, and the decision of the independents is whether to follow the lead of the majors or remain in a steady position of their own choice. Failure to follow the lead of the major companies has often been extremely cost-

ly to independents, as the Report notes at pages 166–169.

The expectation of the independents must be that if they fail to follow the price leader, the leader can and will rescind the increase before they can gain any significant benefit. However, the almost complete absence of ⌐ ⌐cission of price increases indicates that the independent bakeries are almost unanimous in their belief that in the local bread market the space of time between the increase is not sufficient to derive benefits by the independent remaining at his price level. Also, price-followership is often the simplest course of action to avert the onslaught from majors of the practices mentioned supra.

The significance of this information is in determining whether the public interest will be served by accepting the nolo contendere pleas, making it difficult for the State of Michigan to pursue its private treble damage action, but allowing the independents to continue in business without litigation expenses which may drive them out of business.

If any or all of the independents were to go out of business, the public interest would probably be damaged much more than if Michigan were not allowed the benefits of Section 5. "The West Coast Story: A Case Study," found on page 170 of the Report, illustrates how the price zooms once majors control the markets. Between 1953 and 1960, "west coast prices have increased nearly twice as much as the national average." This unusually sharp increase in price was accompanied by an extensive merger acquisition movement on the west coast. The pattern of acquisitions is remarkably similar to the pattern of price increases. "In no other region of the country is there to be found such a striking identity of price changes by competing companies, both as to timing and as to the magnitudes of the changes themselves * * * "

"It is not unreasonable to suggest that the prevalence of a common course of action in raising prices in west coast markets may be closely related to the best level of concentration which has developed in those markets, as well as to an acute awareness on the part of local independent bakers of their vulnerability to retaliation for any departure from such a course of action. Indeed, there does not appear to be any other reasonable explanation for the extent to which west coast bread prices have risen above those in the rest of the Nation." Report, at 178.

Thus, if the independents in Michigan are driven out, the same results as on the west coast may accrue. And I find the financial position of the independents precarious enough to make an extensive antitrust suit likely to drive one or more of them out of business. Other factors arguing for acceptance of the independents' nolo pleas are the fact that they have not been repeated violators, they are small, and not particularly powerful. These considerations, combined with the damage of competition should any of these defendants be driven out of business by expensive litigation, cause me to accept the independents' pleas of nolo contendere.

As to the majors, an entirely different situation exists. They are not small or weak, and litigation is not likely to put them out of business. Furthermore, as noted in the Report and evidenced by the cases, each of the majors has been fined on other occasions for antitrust violations.[2] Clearly there is a need for a stronger deterrent with respect to the

2. U. S. v. American Bakeries, et al., B.B. 1592, Criminal No. 11676 (S.D.Fla.) April 11, 1961.
   American Bakeries, nolo plea and fine of $5,000.
   Ward Foods, nolo plea and fine of $5,000.

U. S. v. Ward Baking Co., et al., B.B. 1593, Criminal 11677 (S.D.Fla.) April 11, 1961.
   American Bakeries, nolo plea and fine of $6,000.
   Ward Foods, nolo plea and fine of $5,000.

871

majors than has been provided in the past by their numerous nolo contendere pleas and consent judgments. Therefore, the request of the majors to change their pleas is refused.

U. S. v. Ward Baking Co., et al., B.B. 1618, Civil 4735 (S.D.Fla.).
American Bakeries, paid $12,000 damage settlement as to Count I, May 8, 1962; entered a consent judgment as to Count II on September 1, 1965.
Ward Foods, paid $12,000 damage settlement as to Count I; entered a consent judgment as to Count II.
U. S. v. General Baking Co., et al., B.B. 1319, Criminal 12991 (N.D.Okla.) March 11, 1957.
Continental Baking, nolo plea and fine of $10,000.
Campbell Taggart (Rainbo), nolo plea and fine of $2,500.
U. S. v. Freihofer Baking Co., et al., B.B. 572, Criminal 8874 (E.D.Pa.) January 9, 1942.

Continental Baking, nolo plea and fine of $2,000.
Ward Foods, nolo plea and fine of $1,500.
U. S. v. New England Bakers Assoc., et al., B.B. 710, Criminal 1577 (D.Mass.) June 22, 1943.
Continental Baking, nolo plea and fine of $5,000.
Ward Foods, nolo plea and fine of $5,000.
Safeway Stores, Inc. v. F. T. C., 366 F.2d 795 (C.A.9, 1966), cert. den. 386 U.S. 932, 87 S.Ct. 954, 17 L.Ed.2d 805 affirming a price-fixing finding by FTC against Continental Baking.
(Apparently the first three cases in this series arise out of the same fact situation.)