**UNITED STATES of America, Plaintiff,**

v.

**BALTIMORE AND OHIO RAILROAD,
et al., Defendants.**

**Crim. No. 81–396.**

United States District Court,
District of Columbia.

July 13, 1982.

James R. Weiss, Kevin R. Sullivan, Claudia Silverman, Coralie Chun Matayoshi, Antitrust Division, Dept. of Justice, Washington, D. C., for plaintiff.

Donald L. Flexner, Richard McMillan, Jr., William Randolph Smith, Todd D. Peterson, Crowell & Moring, Washington, D. C., for B&O RR Co., Inc. and C&O RR Co., Inc.

Kenneth C. Anderson, James V. Dick, Sean F. Boland, Timothy Bergin, Squire, Sanders & Dempsey, Washington, D. C., for Bessemer & Lake Erie RR, Inc.

Richard J. Flynn, Thomas H. Yancey, Sidley & Austin, Washington, D.C., for Norfolk & Western Railway Co., Inc.

## MEMORANDUM OPINION

BARRINGTON D. PARKER, District Judge:

In this antitrust proceeding under the Sherman Act, 15 U.S.C. § 1, five railroads are charged with a 22-year price-fixing conspiracy in the iron ore transportation industry in the Great Lakes region. At the arraignment, one defendant, Consolidated Rail Corporation ("Conrail"), entered a plea of *nolo contendere* which the Court accepted in November 1981. The remaining defendants plead not guilty and filed unsuccessful pretrial motions challenging jurisdictional and substantive bases for the indictment.[1] As the case enters the final pretrial stages, three defendants, Baltimore and Ohio Railroad ("B&O"), Chesapeake and Ohio Railway ("C&O"), and Bessemer and Lake Erie Railroad ("B&LE"), seek to change their pleas from not guilty to *nolo contendere*. The government opposes those motions. The remaining defendant, Norfolk and Western Railway ("N&W"), does not join in the motions and has announced its intention to proceed to trial.

After considering the legal memoranda[2] and oral argument of counsel, the Court

---

1. On April 17, 1982, the Court denied defense motions relating to improper venue, transfer, duplicity, misjoinder, severance, immunity and primary jurisdiction. The Court also held that a *per se* rather than rule of reason analysis should apply. *United States v. Baltimore & O.R.R.*, 538 F.Supp. 200 (D.D.C.1982).

2. *Amicus curiae* briefs were submitted on this issue from parties who are pursuing civil actions under the Clayton Antitrust Act, 15 U.S.C. § 15. Although the Court did not permit the *amici* to voice their view at the hearing on this matter, their positions have been examined to the extent that they add to the govern-

concludes that the motions to enter a plea of *nolo contendere* to the indictment should be granted.

## I.

The government opposes the plea request as an effort by the three railroads to maintain their public image by proclaiming their innocence while avoiding the expense of defending a lengthy criminal prosecution. Recognizing the broad discretion vested in the Court under Rule 11, Fed.R.Cr.P., the government nevertheless contends that such discretion should be exercised only in exceptional circumstances. The prosecution argues that an application of the factors discussed by Judge Edward Weinfeld in *United States v. Standard Ultramarine and Color Company*, 137 F.Supp. 167, 172 (S.D. N.Y.1955), counsels against acceptance of the pleas. *See infra* at p. 822.

The government further asserts that acceptance of the pleas will neither eliminate the need for trial nor significantly reduce its length or complexity. As to Conrail's *nolo contendere* plea, which the government supported, it urges that the situation of the three defendants is distinguishable. It points to the fact that Conrail was formed through a consolidation of several railroads and by virtue of congressional legislation. It also points to Conrail's current financial difficulties and the character and extent of Conrail's cooperation during the grand jury investigation.

The defendants argue that the Court's discretion under Rule 11 permits acceptance of *nolo* pleas despite the objection of the government. Acknowledging the relevance of some of the factors set out in *Standard Ultramarine*, they emphasize the changes in antitrust enforcement in the 25 years since that decision. They note that this case involves antitrust violations in a regulated industry, conduct which terminated prior to indictment, and that the indictment involved corporate rather than individual defendants. They contend that all of these factors support their motions when combined with the fact that acceptance of their pleas would greatly simplify matters for resolution at trial.

*Standard Ultramarine* was an antitrust prosecution of six corporations charged with price-fixing under the Sherman Act. After expressing concern over the significant benefits which accrue to defendants who plead *nolo contendere* in antitrust cases, Judge Weinfeld denied the pleas in light of countervailing public interest considerations. Judge Weinfeld was particularly concerned that acceptance of the *nolo* pleas would provide a windfall to the defendants in parallel civil damage actions by "depriving parties allegedly injured by [the defendants'] conduct of the benefits of the prima facie case under § 5" of the Clayton Act. 137 F.Supp. at 172. Section 5 permits reliance upon a finding of liability in a case brought by the government as *prima facie* evidence in a civil action for treble damages. 15 U.S.C. § 16(a). Private parties may not invoke the benefit of section 5, however, when defendants enter *nolo* pleas.

In addition, Judge Weinfeld expressed concern over allowing large corporate defendants to obtain such an advantage in a corresponding civil suit while paying "token fines" and receiving a mere "slap on the wrist" in the criminal case. 137 F.Supp. at 172. In the following oft-cited passage, a non-exhaustive list of relevant factors was set forth:

> [T]he nature of the claimed violations; how long persisted in; the size and power of the defendants in the particular industry; the impact of the condemned conduct upon the economy; whether a greater deterrent effect will result from conviction rather than from acceptance of the plea—obviously these will vary from case to case. Another circumstance to be given relative, but by no means control-

---

ment's thorough opposition. *Cf., United States v. Roblin Industries, Inc.*, 1980–81 Trade Cas. ¶ 63,644 at 77,485 n.4 (S.D.N.Y.1980); *United States v. Saks & Co.*, 1975 Trade Cas. ¶ 60,219 at 65,589 (S.D.N.Y.1975).

ling weight, is the view of the Attorney General.

*Id.*[3]

Application of those factors must take into account modern trends in antitrust enforcement and additional factors relevant to this case. Indeed, each case must be considered on its facts and additional considerations may properly apply. *E.g., United States v. Roblin Industries, Inc.,* 1980–81 Trade Cas. ¶ 63,644 at 77,485 (S.D.N.Y. 1980). While the Clayton Act provision still provides an advantage in civil cases to defendants who plead *nolo,* other aspects of the antitrust laws have changed significantly since *Standard Ultramarine.* Violations of the Sherman Act are now felonies rather than misdemeanors, and the maximum penalty which may be imposed for a criminal violation has been increased ten-fold to one million dollars. *See United States v. Charmer Industries, Inc.,* 1981–1 Trade Cas. ¶ 64,145 at 76,865 (E.D.N.Y.1981); *United States v. Burlington Industries, Inc.,* 1965 Trade Cas. ¶ 71,376 at 80,615 (S.D.N.Y. 1965). In addition, statistics belie the government's argument that exercise of the Court's discretion should be reserved for exceptional circumstances.[4]

Taking these considerations into account, the *Standard Ultramarine* analysis is not dispositive here. The first factors to be considered under that analysis are the seriousness of the offense and its duration. The alleged price-fixing conduct, as this Court has held, is properly treated according to the *per se* standard which is reserved for clearly anticompetitive offenses. *See Catalano Inc. v. Target Sales, Inc.,* 446 U.S. 643, 647, 100 S.Ct. 1925, 1927, 64 L.Ed.2d 580 (1980); *United States v. Baltimore & O.R.R.,* 538 F.Supp. at 209–11. However, acceptance of the plea is not uncommon in antitrust prosecutions in regulated industries in cases involving similarly pernicious conduct. *See United States v. Atlantic Container Line, Ltd.,* Crim.No. 79–00271 (D.D.C., filed June 1, 1979) (allegations of cover-up of wrongdoing before Federal Maritime Commission); *United States v. Bates,* Crim.No. 79–00272 (D.D.C., filed June 1, 1979) (indictment of individuals in related prosecution); *United States v. Morgan Drive-Away,* Crim.No. 697–73 (D.D.C., filed August 2, 1973) (providing false and misleading testimony before a government agency).[5]

---

**3.** In the civil context, courts typically evaluate consent judgments in light of the public interest. Under the Clayton Act, certain considerations are particularly relevant: the competitive impact, termination of alleged violations, provisions for enforcement and modification, duration of relief sought, alternative remedies, impact on injured parties, and the potential benefit to be derived from a determination of the issues at trial. 15 U.S.C. § 16(e).

**4.** *See* Memorandum of the Government (filed May 17, 1982) at 2–3.

At the request of the Court, the parties gathered data on courts' acceptance of the plea in antitrust cases. The data show that from 1955 to 1980, 2,845 *nolo* pleas were accepted and only 76 were denied. The pleas were accepted in 1,299 instances over government opposition. *See* Acceptance of Pleas of Nolo Contendere in Criminal Antitrust Suits (filed June 1, 1982) (relying upon Clabault & Block, *Sherman Act Indictments, 1955–1980,* 1981–82 Trade Reg. Rep. (CCH) ¶ 45,080 (1981). From 1964 to 1980, 97 percent of the *nolo* pleas offered were accepted in cases where other defendants ultimately proceeded to trial. *See* Table of Defendant N&W (filed May 28, 1981) (compiled from ABA Antitrust Section, *Jury Instructions*

*in Criminal Antitrust Cases 1964–1976* (1978) and ABA Antitrust Section, *Jury Instructions in Criminal Antitrust Cases 1976–1980* (1982)). Government examination of its files as to antitrust cases disposed of by plea since July 1980 shows that of the 158 pleas entered, 118 (74 percent) were guilty and 40 (24 percent) were *nolo.* 34 of the *nolo* pleas were opposed by the government and only one was rejected. *United States v. Auto Driveway,* Cr. 80–449 (D.D.C. 1980). *See* Memorandum of the United States Attaching Recent Statistics on Antitrust Pleas (filed June 1, 1982).

**5.** In two of the cases, *Bates* and *Morgan Drive-Away,* individuals were indicted in addition to corporations. While the Court takes no position on the merits of the defendants' emphasis upon this distinction, it does note the current Assistant Attorney General's comments on this issue:

[T]he criminal sanction is most appropriately used not to go after corporations, but to go after individuals who have knowingly transgressed the law. I would attempt to indict individuals whenever there was such evidence. . . .

Hearing Before the Senate Committee on the Judiciary on the Nomination of William F. Bax-

More recently, *nolo* pleas were accepted over government objection in an antitrust prosecution of an alleged price-fixing conspiracy in the trucking industry, another area which is regulated by the Interstate Commerce Commission. *United States v. Hockaday Truck Brokerage*, Case No. 82–83–Cr–CA (S.D.Fla., plea accepted April 12, 1982). The alleged conduct spanned a period of nine years and the defendants controlled approximately half of the relevant market. In reaching a decision, the Court looked to the absence of prior criminal conduct by the defendants, the potential costs of trial, and the severe financial hardship which would be visited upon the defendants if they were required to proceed to trial.

In this case, consideration of the defendants' degree of control within the industry and the resulting impact of the conduct upon the economy weigh in favor of denying the proposed pleas. Each defendant is a sizable force within the iron ore transport industry in the Great Lakes region. *Cf. United States v. Saks & Co.*, 1975 Trade Cas. at 65,860 (*nolo* pleas accepted from corporate defendants involved in less than one percent of the relevant market). The resulting impact on the economy has been significant. In addition, as to the view of the Attorney General, the Court is mindful of the Justice Department's position that guilty pleas and convictions more readily advance the public interest. *Standard Ultramarine*, 137 F.Supp. at 172; *United States v. Binney & Smith, Inc*, 1980–81 Trade Cas. ¶ 63,747 at 77,976 (S.D.N.Y. 1980); *see* U.S. Department of Justice, *Principles of Federal Prosecution*, Part E at 33, *reprinted in* 27 Crim.L.Rep. (BNA) No. 18 at 3277–93 (July 28, 1980). These factors, however, are not sufficient in themselves to deny the present pleas in light of several additional factors.

Turning to the issue of the effect which the pleas would have upon deterrence of

such conduct, it is significant that the defendants voluntarily terminated their activities prior to indictment.[6] *United States v. Minneapolis-Honeywell Regulator Co.*, 1963 Trade Cas. ¶ 70,863 at 78,495–96 (D.Minn. 1963). It therefore is not unreasonable to assume that these defendants and others in the industry will carefully avoid involvement in similar conduct in the future.

As to the deterrence considerations in light of the pending civil actions, the mere existence of those claims and the corresponding threat of treble damages is a significant factor. *Cf., Standard Ultramarine*, 137 F.Supp. at 172–73.[7] The Court has considered the interest of the private plaintiffs in securing the Clayton Act benefits which accompany a finding of guilt, however, in this Court's view, the existence of pending civil actions does not require a denial of the pleas. *Charmer Industries*, 1981–1 Trade Cas. at 76,865; *Roblin Industries*, 1980–81 Trade Cas. at 77,485. To conclude otherwise and find that acceptance of the pleas hinges on the existence of a threat of civil liability virtually eliminates the availability of a *nolo* plea whenever a private civil action is pending. There is no evidence that Congress intended to impose such a limitation on the scope of the Clayton provision. *Burlington Industries*, 1965 Trade Cas. at 80,615.

The effect that acceptance of the *nolo* pleas would have upon the duration and the complexity of trial is significant. The government notes, however, that where courts have considered such effect, acceptance of the plea would have eliminated the need for trial. *See Charmer Industries*, 1981–1 Trade Cas. at 76,866; *Roblin Industries*, 1980–81 Trade Cas. at 77,485. And since this is a conspiracy case the government claims that its proof will necessarily entail many matters regardless of which defendants remain.

These considerations notwithstanding, the absence of three of the four defendants

---

ter to be Assistant Attorney General—Antitrust Division, 97th Cong., 1st Sess. at 18 (1981).

**6.** *See* Supplemental Bill of Particulars (filed December 9, 1981).

**7.** Defendants B&O and C&O, for example, are defendants in four civil actions. *See* Defendants B&O and C&O's Memorandum, (filed May 11, 1982).

would necessarily shorten the length of trial by eliminating many aspects of the case in opposition to the government. *Saks & Co.*, 1975 Trade Cas. at 65,860; *see supra* n.4. These defendants intend to present scores of witnesses and exhibits at trial in the event their motions are denied. Elimination of the three defendants would decrease the number of contested issues and thereby reduce the complexity of the trial since the defense of N&W, the remaining defendant, is more narrowly focused [8] than that of the others.

The prior acceptance of Conrail's *nolo contendere* plea also favors acceptance of these pleas from the three defendants. *See Burlington Industries*, 1965 Trade Cas. at 80,615–616. The government argues, however, that because of major differences between these defendants and Conrail, acceptance of Conrail's plea should provide no support for the three defendants' motions. First, the government alludes to Conrail's troubled financial situation, but this is clearly a factor which bears upon the size of a fine rather than whether a plea should be accepted. The more difficult distinction is the degree and character of Conrail's cooperation with the government's investigation. Although each defendant cooperated with the government, unlike the others, Conrail voluntarily cooperated prior to indictment. In addition, Conrail released privileged documents which the government found to be especially helpful. It is significant to note that while Conrail made these documents available, the government has not placed any of the items on its exhibit list for trial. *See* Defendants' B&O and C&O's Memorandum of Points and Authorities at 4 n.5 (filed May 11, 1981). A further distinction is that Conrail conceded that the government could prove its case.[9]

As to the relative involvement of the defendants, the government asserts that no one defendant is more culpable than any other. In this vein, the government adds that it was Conrail that took the initiative in ending the alleged conspiracy. The significance of that observation however, is diluted by the fact that Conrail, by holding a substantial share of the iron ore transportation market, exercised enough control over the alleged conduct that it was thereby able to terminate the activity unilaterally. *See* Bill of Particulars at 31 (filed December 9, 1981); Supplemental Bill of Particulars (filed May 7, 1981); Defendants' Memorandum, *supra* at 4. Whatever discrepancies may exist between the Conrail situation and that of the three moving defendants, those factors may be readily accounted for at sentencing.

■ The Court finds no compelling reason to reject the proffered *nolo* pleas. Their acceptance will reduce the complexity of the issues at trial and the existence of multiple treble damage actions adequately deters conduct similar to that alleged in the indictment.

---

**8.** Defendant N&W is not alleged to have entered the conspiracy until 1968. Moreover, N&W intends to call considerably fewer witnesses than the other defendants.

**9.** Conrail agreed, for purposes of the proceeding, that the government could prove the charges beyond a reasonable doubt. Conrail further agreed not to make any public statement inconsistent with the agreement and to instruct its corporate officers and employees to that effect. *See* Plea Agreement Between United States and Defendant Consolidated Rail Corporation (approved November 11, 1981).