**In re Hugh D. SUMMERS, Debtor.**

**United States of America, Plaintiff,**

**v.**

**Hugh D. Summers, Defendant.**

**Bankruptcy No. 98–3306BIF.
Adversary No. 99–1017.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Jan. 11, 2001.

Christopher R. Zaetta, U.S. Dept. of Justice, Tax Division, Washington, DC, for plaintiff.

Mark D. Freeman, Southampton, PA, Michael S. Klein, Blue Bell, PA, for defendant.

### *MEMORANDUM OPINION*

JOSEPH L. COSETTI, Bankruptcy Judge.

The matter before this court is the Motion for Summary Judgment filed by the Plaintiff United States of America, Internal Revenue Service, seeking a determination that the tax liability owed by Debtor/Defendant Hugh D. Summers is nondischargeable. For the reasons expressed below, the Motion for Summary Judgment shall be granted.

*Facts*

Debtor/Defendant Hugh D. Summers ("Summers") filed a voluntary Chapter 7 petition on October 9, 1998. On November 15, 1999, the United States of America, Internal Revenue Service ("IRS") filed the above-captioned complaint seeking a determination that all of Summers' tax obligations for 1985, 1986, 1988 and 1991 were not discharged, pursuant to 11 U.S.C. § 523(a)(1)(C).

## Analysis

■ A motion for summary judgment should be granted if "the pleadings, depositions, answer to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." F.R.Civ.P. 56; F.R.Bankr.P. 7056. The Court concludes that genuine issues of material fact are not present.

The Court of Appeals for the Third Circuit has addressed the substantive issues raised by 11 U.S.C. § 523(a)(1)(C) in *In re Fegeley*, 118 F.3d 979 (3d Cir.1997). Fegeley failed to file his tax returns. He later filed them after being contacted by the Criminal Investigation Division of the IRS. There was no allegation that the tax returns, upon filing, were fraudulent. In 1989, Fegeley pled guilty to one of three counts charged for willful failure to file his income tax.

After Fegeley filed bankruptcy in 1991, the IRS argued that the tax liabilities for 1983–85 were nondischargeable pursuant to 11 U.S.C. § 523(a)(1)(C). The sole issue before the circuit court of appeals was whether Fegeley " 'willfully ... attempted to evade or defeat' his taxes within the meaning of the second part of § 523(a)(1)(C)." 118 F.3d at 983.

The Court of Appeals for the Third Circuit also gave weight to the fact that the statute includes the phrase "in any manner." The Court of Appeals stated that the nonpayment of taxes should be looked to as "relevant evidence which [we] should consider in the totality of conduct to determine whether or not the debtor willfully attempted to evade or defeat taxes." *Id.* citing *Dalton v. I.R.S.*, 77 F.3d 1297, 1301 (10th Cir.1996).

The court set forth a two part analysis to determine the second prong of the statute. First, it looked to a conduct requirement and second to a mental state requirement in interpreting "willfully." The court found that Fegeley's intentional failure to file his tax returns combined with his failure to pay when he had the financial ability to do so showed that he willfully attempted to evade or defeat his taxes. This conduct fell within that contemplated by the exception to discharge provision.

Regarding the mental state requirement, the court adopted the "civil willfulness" standard requiring a showing that the actions of the debtor were voluntary, conscious and intentional. *Id.* at 984. That is, that the debtor had the duty, knew he had the duty and voluntarily and intentionally violated the duty. It was held that Fegeley had the duty to file his tax returns, knew he had the duty and voluntarily and intentionally violated it. In addition, the court considered the fact that Fegeley had the financial wherewithal to discharge the duty during the relevant time.

Similarly, in *In re Griffith*, 206 F.3d 1389 (11th Cir.2000), the 11th Circuit Court of Appeals has now interpreted the statute in a fashion similar to the other circuit courts that have addressed the issue. The 11th Circuit Court has now determined that § 523(a)(1)(C) renders tax debt nondischargeable where the debtor engaged in affirmative acts to evade payment of taxes. *Id.* at 1395. It also reaffirmed its primary holding of *In re Haas*, 48 F.3d 1153 (11th Cir.1995) that mere nonpayment of taxes without more does not constitute a willful attempt to evade or defeat the tax but found that the statute is applicable to situations of nonpayment where a willful attempt to evade or defeat has occurred. *Id.* In any event, this court is bound to follow the precedent established in this circuit in *Fegeley*.

In this analysis, it is important to remember that this proceeding is not a criminal proceeding. It is a civil proceeding. The burden of proof is not the burden in a criminal case. The result sought by the United States is that a tax debt will not be discharged by the debtor's bankruptcy. The debtor's liberty is not at stake in a dischargeability proceeding.

Summers filed his tax returns for 1985, 1986, 1988 and 1989. However, he excluded the income he caused to be transferred to an overseas corporation that he controlled. After pleading guilty to conspiracy, he agreed to amend his previous returns. He then amended the returns and included the income which his scheme returned to him as "loans."

The court quotes from the Memorandum of Law in Support of the United States' Motion for Summary Judgment, pp. 4–7:

As a result of Summers' actions, on May 6, 1992, the United States filed a criminal Information with the United States District Court for the District of Massachusetts, Criminal No. 92–10120, charging Summers with a "Klein" conspiracy, in violation of 18 U.S.C. § 371, to defraud the United States (Internal Revenue Service) during the years 1982 through 1987 by concealing and diverting income through Coastal. *See* Declaration of Christopher R. Zaetta Exhibits 1. Paragraph one of the Information reads as follows:

From on or about May 1, 1981, and continuing thereafter up to and including September 30, 1987, in the District of Massachusetts, the Eastern District of Pennsylvania, and elsewhere, Laban Quimby, *Hugh D. Summers,* defendant herein, Coastal Development, Ltd. and Lodswell and Chatham, Ltd., and others, *did* unlawfully, *willfully* and knowingly *conspire,* confederate and agree together

and with others, both known and unknown *to defraud the United States by* impeding, impairing, obstructing and *defeating the lawful government functions of the Internal Revenue Service of the Treasury Department in the ascertainment, computation, assessment and collection of the revenue; to wit, income taxes.*

Declaration of Christopher R. Zaetta, Exhibit 1, ¶ 1 (emphasis added).

Summers plead guilty to the Information, which was attached to and incorporated in the guilty plea. *See* Declaration of Christopher R. Zaetta, Exhibit 2, ¶ 1. As part of the agreement, Summers acknowledged that between 1982 and 1990, he received $963,000.00 in unreported commission income from his dealings with Coastal. (fn1: In the guilty plea, Summers also acknowledges that the IRS believes that the total amount of the unreported income was actually $1,192,530.30, and Summers agreed to cooperate with the IRS to determine the amount of the income actually unreported. *See* Declaration of Christopher R. Zaetta, Exhibit 2, ¶ 4.) *See id.* ¶ 4. In addition, Summers agreed to "use his assets, wherever they may be located, in an effort to satisfy his liability to the Internal Revenue Service." *Id.* On the third of April, Summers signed under the paragraph that stated:

I have read this letter of Agreement in its entirety and discussed it with my attorney, Benjamin Lerner. I hereby acknowledge that it sets forth my agreement with the United States Attorney's Office for the District of Massachusetts. I further state that there have been no additional promises or representations made to me by any official of the United States government in connection with this matter. *Id.* at 3.

On January 25, 1993, Summers' criminal case was transferred to the U.S. District Court for the Eastern District of Pennsylvania, and was docketed as Criminal No. 93–35. On May 24, 1993, Summers, his attorney and the Assistant United States Attorney appeared for sentencing before the Honorable Anita B. Brody in the Eastern District of Pennsylvania. *See* Declaration of Christopher R. Zaetta, Exhibit 3. At the hearing, Summers, through his attorney, accepted full responsibility for conspiring to defraud the Internal Revenue Service for the years 1982–1990. *See id.* In this regard, his attorney stated:

He has—we're not denying, we are accepting responsibility for what occurred here. And these are not mere words, either, because prior to appearing before you today, Mr. Summers has prepared and filed with the IRS, amended tax returns, not only for the years before you, but for the entire decade. And today, he owes, acknowledges and is prepared to deal with a debt to the IRS of almost a quarter of a million dollars, that he owes them.

Declaration of Christopher R. Zaetta, Exhibit 3, pg. 15, lines 6–13. Based on the representations that he accepted full responsibility for his actions, coupled with his promise to make every attempt to pay his tax liability back in full, the Assistant United States Attorney made no recommendation to the court regarding incarceration. *See* Declaration of Christopher R. Zaetta, ¶¶ 3–4. This, as Summers' attorney conceded, is a "unique position" for the government to take. *See* Declaration of Christopher R. Zaetta, Exhibit 3, pg. 13–14.

Taking into consideration that the government made no recommendation regarding incarceration in the case, and also noting the debtor's willingness to admit his guilt and repay the debt, the District Court imposed no jail time and elected to sentence the defendant to four (4) years probation. *See id.*, pg. 19–20. The court made a condition of the probation that Summers "make a good-faith effort to pay [his] liability to the Internal Revenue Service . . . ." *Id.* at 20, lines 18–21. The court informed Summers of his right to appeal the sentence and, at that point, the following exchange occurred between the court and Summers:

[The court]: Mr. Summers, I want to make sure you understanding [sic] that failure to comply with the terms of your sentence, is, in itself, a criminal offense; do you understand that?

The Defendant: Yes, your Honor.

*Id.*, pg. 21, lines 19–22.

On or about May 24, 1993, as a result of the terms of his plea agreement, Summers filed amended Forms 1040x income tax returns for the years 1982 through 1990 reflecting an amount due and owing of $225,734.00. *See* Complaint and Answer ¶ 11, Certificate of Assessments and Payments dated October 21, 1999. Pursuant to Summers' amended income tax returns referred to in paragraph 11 above, on November 8, 1993, the IRS assessed income tax liabilities against Summers for tax years 1985, 1986, 1988, and 1989, as set forth in the table which follows:

| Type of Tax Assessment | Tax Period | Amount of Assessed Tax and Assessed Interest |
|---|---|---|
| 1040 | 1985 | $ 56,294.49 |
| 1040 | 1986 | $142,484.29 |
| 1040 | 1988 | $ 38,093.01 |
| 1040 | 1989 | $ 95,475.93 |
| | Total | $332,347.72 |

After Summers filed his amended returns the IRS issued a further notice of deficiency seeking additional unpaid income taxes and fraud penalties for the 1982–1990 years.

On August 28, 1995, Summers filed a petition with the U.S. Tax Court challenging the proposed assessments found in the Notice of Deficiency. *See* Complaint and Answer ¶ 19. On September 26, 1997, the Tax Court issued a decision in Summers' case pursuant to an agreement between Summers and the IRS. *See* Exhibit 4 to the Declaration of Christopher R. Zaetta. In addition to the additional tax that the parties agreed was owed for the 1983, 1985 and 1986 years, the Tax Court's decision determined that Summers was liable for fraud and negligence penalties in excess of $200,000.00. *See Id.* The IRS assessed the additional tax and penalties on November 24, 1997. *See* Certificate of Assessments and Payments dated October 13, 1999. The debtor has not appealed this Tax Court order and finding.

■ It is not disputed that Summers plead guilty under 18 U.S.C. § 371 to a conspiracy to impair the lawful functions of the Internal Revenue Service. Such a 18 U.S.C. § 371 conspiracy is generally referred to as a "Klein Conspiracy" after the case of *United States v. Klein,* 247 F.2d 908, 915 (2d Cir.1957), cert. denied, 355 U.S. 924, 78 S.Ct. 365, 2 L.Ed.2d 354 (1958). The elements of a *Klein* conspiracy are as follows:

1. An agreement by two or more persons;

2. To impede, impair, obstruct or defeat the lawful functions of the Internal Revenue Service in the collection of income taxes; and

3. At least one of the conspirators committed an overt act in furtherance of the agreement.

*United States v. Shermetaro,* 625 F.2d 104, 109 (6th Cir.1980).

Summers not only pled guilty to the agreement to obstruct the functions of the IRS, but he also admitted, through the means described in the Information, *that*

*he committed the overt act of defrauding the IRS in furtherance of the agreement.* The overt acts to which Summers pled guilty are detailed on pages 3 and 4 of the Information. Specifically, in the Information, Summers admitted that he received in excess of $950,000.00 from 1982–1990 in income that he diverted to Coastal and did not report on his tax returns. This overt act was done "willfully and knowingly" "to defraud the United States" by "obstructing and defeating the lawful government functions of the Internal Revenue Service of the Treasury Department in the ascertainment, computation, assessment and collection of the revenue; to wit, income taxes." This language, contained on the first page of the Information is conclusively established for purposes of this civil litigation, *see Emich Motors Corp. v. General Motors Corp.,* 340 U.S. 558, 568, 71 S.Ct. 408, 95 L.Ed. 534 (1951); *In re Raiford,* 695 F.2d 521, 523 (11th Cir.1983), and further it is identical to second prong of Section 523(a)(1)(C) of the Bankruptcy Code.

First, Summers' admission that he both agreed to defeat the lawful functions of the IRS and committed the act in furtherance of that goal, collaterally estops him from now arguing that he did not willfully attempt to evade or defeat his tax liabilities for the years 1985, 1986, 1988 and 1989.

Second, at a later time in a case Summers brought in the Tax Court, he agreed that he had unreported income for the years at issue in this case. Summers is collaterally estopped from now saying that he had no further income during those periods attributable to the Coastal scheme to defraud the IRS. The debtor is collaterally estopped from attempting to relitigate the issue of whether he had unreported income since such issues had been determined by the Tax Court and they were not appealed.

Third, Summers, as part of his plea agreement, filed amended tax returns, signed under penalty of perjury, acknowledging and admitting the fact that he had originally filed false tax returns.

In sum, Summers has acknowledged and conclusively admitted for purposes of this litigation his wrongdoing three times, first by a guilty plea, second by agreeing to the liabilities in his Tax Court cases, and three by filing amended returns under penalty of perjury. Under the doctrine of collateral estoppel, Summers cannot now in this dischargeability proceeding collaterally attack his conclusive admission that he attempted to evade payment and assessment of his tax.

Summers now states that he never thought he was guilty in the original plea. He explains that he entered the plea to avoid jail time. He further argues that time in jail would have been a burden to his family and especially his son.

The Court agrees he did not serve jail time and jail would have been burdensome to his family. But he cannot deny that he actually and voluntarily plead as recited above.

What he wants to do is relitigate the basis of this information and the guilty plea. The Court now finds under all the circumstances and facts that he may not so proceed.

### Post Conviction

■ Post conviction, there have been further continuing attempts to evade and defeat the taxes he owes the United States. Since pleading guilty to conspiracy to defraud the IRS, Summers has continued to avoid the payment of his tax liabilities for the 1985, 1986, 1988 and 1989 years despite the fact that he agreed in his guilty plea to "undertake to use his assets, wherever they may be located, in an effort to satisfy his liability to the Internal Revenue Service." Exhibit 2 to Declaration of Christopher R. Zaetta, ¶ 3.

Summers had at various times after conviction owned sufficient resources to satisfy his tax liability, but voluntarily, consciously and intentionally chose not to pay those assets over to the IRS. Summers admitted at his plea that from 1982 through 1990 he diverted over $963,000.00 in commission income to Coastal, and brought a significant portion of that money back into the United States by utilizing his "loan system." Summers used none of the proceeds from that scheme to pay his tax liabilities despite agreeing that those liabilities were owed. During the same time period he was diverting his income from Coastal, Summers was also earning over $30,000.00 in real estate income. *See* Transcript of Deposition of Hugh D. Summers, May 10, 2000 at 136 lines 15–16 and 165.

After pleading guilty to criminal conspiracy to defraud the IRS, Summers continued to earn a gross salary from $96,000.00 to $108,000.00 a year as a "manufacture's sales representative." *See* Debtor's Bankruptcy Schedule I; Deposition of Hugh D. Summers, June 21, 2000 at 140.

In addition to his regular income above, post conviction he owned rental property with a current market value of $490,000.00 *See* Debtor's Bankruptcy Schedule A. Summers also had other valuable real estate assets which he sold, the proceeds of which could have been used to satisfy his tax liabilities. Assuming the evidence most favorable to Summers, Summers elected to allocate those proceeds to speculative "investments" in preference to the IRS. His only explanation was that he was attempting to create an estate to care for his son.

In 1996 and 1997, Summers sold two "groups" of properties. *See* Transcript of Deposition of Hugh Summers, May 10,

2000 at 18–19. The first group of properties consisted of two parcels of land on which there were a total of four rental units, including a Dunkin' Donuts and an insurance agency. *See id.* at 20–21. Summers estimated that he sold the properties for "[s]omewhere in the neighborhood of seven to $800,000." *I* d. at 19. Of that amount Summers netted, after payment of the pending mortgages, "around $400,000.00." *Id.* at 19–20.

The second group of properties consisted of three parcels of land on which Summers grossed $400,000.00. *Id.* at 21. From that sale, Summers netted "in the neighborhood of $250 to possibly $300,000." *Id.* at 22. In two years, therefore, Summers netted approximately $700,000.00 from the sale of his real estate, and used none of that money to pay his tax liabilities.

The money received from the sale of the two groups of properties would have been more than enough to pay Summers' outstanding tax liability to the IRS. Instead, Summers used the money from the first sale to enter into a speculative "investment," and the money is now "gone." *See id.* at 192, 206.

The money from the sale of the second group of properties went to the Mt. Albert Domestic Non Grantor Trust for the purchase of a private annuity, and was immediately transferred to various cities and he now admits was sent offshore to a jurisdiction outside the United States. Summers testified in deposition without documented proof that he is to receive a monthly income from the annuity of approximately $7,000.00 at age 75, with any remaining proceeds going to his wife upon his death. None of the money is earmarked for the payment of his tax debts. These assets appear to be out of the country for at least 10 years.

In summary, since Summers appeared before the District Court for the Eastern District of Pennsylvania and promised to use his assets to pay his tax liability, Summers has had the resources sufficient to satisfy his tax liabilities. Instead he has voluntarily, consciously and intentionally chose to allocate those resources to speculative "investments" and other discretionary allotments which have the intended effect of putting his assets beyond the reach of his creditors and the IRS for at least ten years. Such behavior under the *Fegeley* standard is sufficient to meet the civil willfulness standard and to determine that Summers' tax liabilities are nondischargeable.

By his own testimony in his deposition at page 34, lines 15–24 and page 35, lines 1–21:

Q. Why, then, is your daughter and son-in-law holding those funds?

A. Because I was looking to get into an investment. Also, while all this is going on I'm considering an investment that, again, would have given me the ability to solve my real estate problems and my IRS problems. Also, I sent that money to them because at that point in time the banks had a judgment recorded against me, and I was fearful that if I put that money in my account that they might somehow come and take it, as the IRS had done when they levied my account.

Q. So you were fearful that the banks would take the $300,000 from the sale?

A. That's correct.

Q. Were you fearful that the IRS would come and take that money?

A. Not at that point, no.

Q. Why?

A. Well, because the IRS hadn't really taken any collection action at that point. I had gotten numerous letters over the years—well, a lot of notices from the

IRS stating we are going to levy your account. We re going to record liens. But they never did it. And this happened time after time after time. So, I sort of forgot about that.

Mr. Summers' testimony admits he knew how to avoid the effect of a bank or an IRS lien on his assets. Further, he transferred the assets and has defeated the collection effort of the IRS.

### Summers' Defense

■ Mr. Summers relies on several factors as a defense. There has been much stress and anxiety in his life. In 1980, his daughter at age 21 was diagnosed with the mental illness of schizophrenia. In 1985, his son at age 18 was also diagnosed with schizophrenia. At present his daughter's illness has modified and presents itself infrequently. His son's illness has been quite difficult to manage and has caused many problems. His son is unable to care for himself financially.

The lawyer for Summers argues that Summers' various episodes with various investment schemes were not engaged in with the intent to defeat or evade he tax but to provide for his family. For this purpose the report of Gerald Cooke, Ph.D and Margaret Cooke, Ph.D., P.C., clinical and forensic psychology Licensed Psychologists is presented. The psychologist concludes:

In summary, it is my opinion that the following diagnoses characterize Mr. Summers since at least the events of 1980:

1. Dysthymic (Depressive) Disorder with Anxiety Features;

2. Personality Disorder, Not Otherwise Specified, with Self–Defeating Features. Because of Mr. Summers' personality makeup and the need to see himself as the strong protector of his family, he has never been able to acknowledge the level of his own emotional difficulties or to seek treatment. It is likely that had he begun to receive treatment 20 years ago he would have avoided some of the difficulties that have occurred. While I understand that his current financial condition may make it difficult for him to obtain appropriate treatment, I would certainly recommend that he is in need of both therapy and medication to deal with his underlying depression and with the personality dynamics described in this report.

In regard to the referral questions, the findings of the psychological evaluation are consistent with the following opinions:

1. Mr. Summers plead Guilty to Tax Fraud because he found himself in a desperate situation in which, though he believed he had done nothing wrong, he could not take the chance of going to prison and portraying the role of protector of his family that was so important to him, both for personality dynamic reasons stemming from his childhood and, also from the very realistically based need to care for two mentally ill children, particularly his son John, who is apparently quite impaired.

2. Secondly, regarding the purchasing of the annuity, the findings are consistent with Mr. Summers again feeling desperate to protect his family and to provide for them. When the emotionality of this need rises to a certain level, Mr. Summers becomes stressed and desperate, and those emotions cloud his judgment.

All opinions presented in this report are held to a reasonable degree of psychological certainty.

Summers Evaluation dated January 11, 2000, Gerald Cooke, Ph.D., pages 15–16.

The United States challenges Dr. Cooke as expert witness. For purposes of this summary judgment motion only, we accept Dr. Cooke as an expert. However, the report, if accepted, does not assert that Mr. Summers' actions were involuntary and/or that he did not know the consequences of his actions. Mr. Summers and Dr. Cooke assert that he relied on individuals who he believed were legal experts to protect the actions he voluntarily undertook.

This psychological report is not adequate for that purpose. It is clear to the court from the report and from the deposition of Mr. Summers that he voluntarily committed the acts which defeated collection of the tax.

Mr. Summers also desires to offer Kevin Ryan, a West Chester, Pennsylvania attorney as having provided him with advice to show that his efforts to defeat the IRS with various transactions with Mr. Miller "never raised any concerns that the proposed trust and annuity would constitute an attempt to evade or defeat payments of the taxes." I have read the deposition of Mr. Ryan and his file notes. I have also read the deposition of the debtor. They provide no affirmative support that relates to 11 U.S.C. § 523(a)(1)(C).

If we accept Mr. Ryan's deposition as truthful, he offers no support for Summers' action under 11 U.S.C. § 523(a)(1)(C). This Court does find this as a close question. Mr. Ryan's statements offer no help to Mr. Summers on the issue of avoiding and defeating post-conviction payment.

Guilty pleas in a criminal matter are governed under a higher standard of proof than dischargeability. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). The Debtor cannot create an issue of material fact by taking position inconsistent with his prior guilty plea on a stipulation entered as part of the guilty plea. *In re Toti,* 24 F.3d 806 (6th Cir. 1994).

### Conclusion

There are no genuine issues of material fact in dispute. The motion for summary judgment shall be granted. Taxes owed for the years 1985, 1986, 1988 and 1989 are not dischargeable under the standard set in *Fegeley.* An appropriate order shall be entered.